T.C. Memo. 2011-67



UNITED STATES TAX COURT



LARRY E. TUCKER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 3165-06L.                    Filed March 22, 2011.



        P filed income tax returns for 2000, 2001, and
2002 that reported tax due; but he did not pay the tax.
In early 2003, when P's tax liabilities totaled at
least $14,945, P used $44,700 for day trading and lost
$22,645.  The Internal Revenue Service assessed the tax
and issued to P a notice of the filing of a "Notice of
Federal Tax Lien" (NFTL).  After an initial hearing and
an adverse determination, P filed a timely appeal of
that determination with the Tax Court pursuant to
I.R.C. sec. 6330(d)(1), contending that the Office of
Appeals improperly rejected an offer-in-compromise
(OIC) that P proposed.  This Court ordered a remand to
the Office of Appeals for further consideration of P's
OIC.  At a supplemental collection due process hearing,
the Office of Appeals preferred a partial payment
installment agreement but P proposed only his OIC.  In
calculating P's reasonable collection potential for
purposes of evaluating his OIC, the Office of Appeals
considered P's day trading to constitute asset
dissipation.  The Office of Appeals issued a

supplemental notice of determination denying P's proposed OIC and upholding the filing of the NFTL. The parties have filed cross-motions for summary judgment.

Held: Where P engaged in day trading in disregard of his outstanding Federal income taxes, the resulting losses constitute dissipation of assets. R's Office of Appeals did not abuse its discretion in denying P's proposed OIC and upholding the filing of the NFTL.

Carlton M. Smith and Zachary Grendi (student), for petitioner.

Lydia A. Branche, for respondent.

MEMORANDUM OPINION

GUSTAFSON, Judge: This case is an appeal, pursuant to section 6330(d)(1),[1] by which petitioner Larry E. Tucker seeks this Court's review of a determination by the Office of Appeals of the Internal Revenue Service (IRS) to reject Mr. Tucker's proposed offer-in-compromise (OIC) and to sustain the filing of a notice of Federal tax lien (NFTL) in order to collect Mr. Tucker's unpaid income taxes for tax years 2000, 2001, and 2002. That determination was made after the Office of Appeals conducted a collection due process (CDP) hearing pursuant to section 6330(c) and a supplemental CDP hearing pursuant to a remand of this Court. The IRS's determination at issue in this

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code ("Code", 26 U.S.C.) and all Rule references are to the Tax Court Rules of Practice and Procedure.

case is reflected in an initial "Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330" and in a "Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330". This matter is currently before this Court on the parties' cross-motions for summary judgment filed under Rule 121.

The specific issue to be decided is whether the Office of Appeals abused its discretion in September 2006--at a time when Mr. Tucker owed more than $39,000--by rejecting an OIC pursuant to which Mr. Tucker would have paid $317 over 116 months, totaling $36,772. We will grant respondent's motion and deny Mr. Tucker's motion. We hold that the Office of Appeals did not abuse its discretion in rejecting Mr. Tucker's OIC and sustaining the filing of the NFTL.

### Background

The parties' motion papers and the supporting exhibits attached thereto show that there is no dispute as to the following facts. At the time he filed his petition, Mr. Tucker resided in New Mexico.

### Mr. Tucker's tax returns

Mr. Tucker earned income in the five years 1999 through 2003. For the first three of those years Mr. Tucker failed to

timely file tax returns. For the years at issue[2]--2000, 2001,
and 2002--he simultaneously filed Forms 1040, "U.S. Individual
Income Tax Return", on April 15, 2003.[3] In March 2004 he filed
an untimely Form 1040 for tax year 1999. And in April 2004 he
timely filed a Form 1040 for tax year 2003. For 2000 through
2003, some but not all of his tax liabilities were either prepaid
or withheld from his wages. The IRS assessed the income tax
liabilities that Mr. Tucker had self-reported. After the
application of prepayment and withholding credits, Mr. Tucker had

---

[2]The IRS's notice of determination at issue referred to
liabilities for only three years--2000, 2001, and 2002--and this
Court lacks jurisdiction to review collection of the liabilities
for the years not included in the notices of determination. See
Sullivan v. Commissioner, T.C. Memo. 2009-4. However, as is
explained below, the OIC that Mr. Tucker submitted in his CDP
hearing addressed five years--1999 through 2003. In determining
whether the rejection of the OIC and the collection of
liabilities for the years included in the notices of
determination is appropriate, this Court is authorized (as the
settlement officer was required) to consider "any relevant issue
* * * including * * * offers of collection alternatives". Sec.
6330(c)(2)(A), (d). Therefore, we evaluate the settlement
officer's exercise of discretion in rejecting the OIC, taking
into account all the liabilities that were proposed to be
compromised, even though we do not have jurisdiction to review
the collection of all those liabilities. See, e.g., Orum v.
Commissioner, 123 T.C. 1 (2004) (reviewing an OIC that covers
income tax liabilities for tax years that are both within and
outside of this Court's jurisdiction), affd. 412 F.3d 819 (7th
Cir. 2005).

[3]In our previous Opinion in this case, Tucker v.
Commissioner, 135 T.C. 114, 117 (2010), we mistakenly stated that
Mr. Tucker untimely filed all of these returns in June 2003. The
transcripts of Mr. Tucker's accounts show that, while these
returns were not processed by the IRS until June 2003, they were
received by the IRS on April 15, 2003. These filings were
therefore timely as to 2002 but untimely as to 2000 and 2001.

an outstanding reported tax due (not including any interest or penalties) for each year as follows:

| Tax Year | Income Tax Reported | Withholding Credits | Reported Tax Liability Due |
|---|---|---|---|
| 1999 | $3,356 | -0- | $3,356 |
| 2000 | 14,808 | ($6,702) | [1]8,106 |
| 2001 | 3,629 | (146) | 3,483 |
| 2002 | 13,404 | (10,353) | 3,051 |
| 2003 | 6,947 | (633) | 6,314 |
| Total | | | 24,310 |

[1]After filing his return for tax year 2000, Mr. Tucker made three voluntary payments of $349 towards the amount due. As a result, by July 2004, when the collection action at issue started, the tax due for 2000 (without any accruals) was reduced to $7,059, and the tax due for all five years (without any accruals) was reduced to $23,263.

On May 8, 2004, nearly a year after Mr. Tucker filed his returns for 2000, 2001, and 2002, the IRS sent to him a "Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing" (hereinafter, "levy notice") for those three years, pursuant to sections 6330(a)(1) and 6331(d)(1), advising him of the IRS's intent to levy upon his property. Mr. Tucker did not timely request a hearing under section 6330 with respect to that notice. For the same three years, the IRS sent to Mr. Tucker on July 22, 2004, a "Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320" ("lien notice"), pursuant to section 6320(a)(1), advising him that the IRS had filed an NFTL against him.

Mr. Tucker's July 2004 OIC

On July 29, 2004, after the IRS had issued the lien notice, but before Mr. Tucker received it, he submitted a Form 656, "Offer in Compromise", proposing to settle his income tax liabilities for the five years 1999 through 2003. At that time, his unpaid tax liabilities for those five years totaled $24,310, and with interest and additions to tax ("accruals"), his total five-year liability was approximately $35,000.[4] Mr. Tucker proposed to compromise that five-year liability for a total of $6,000 payable in monthly payments of $100 over 60 months. Mr. Tucker also submitted a Form 433-A, "Collection Information Statement for Wage Earners and Self-Employed Individuals", detailing his assets, monthly income, and monthly expenses.

The IRS received Mr. Tucker's July 2004 OIC on August 4, 2004. By letter dated August 25, 2004, the IRS examiner who evaluated the July 2004 OIC informed Mr. Tucker that the IRS had "determined that you have the ability to pay your liability in

---

[4]The record reflects that Mr. Tucker's outstanding liabilities with accruals through August 16, 2004, were $35,591.26, so we estimate his total outstanding liabilities (i.e., unpaid taxes plus accruals) as of July 29, 2004 (i.e., less than one month earlier), to be approximately $35,000.

full within the time provided by law."[5]   Mr. Tucker was given 14 days to dispute this determination.

At the same time the IRS was evaluating Mr. Tucker's July 2004 OIC, Mr. Tucker timely submitted to the IRS on August 11, 2004, a Form 12153, "Request for a Collection Due Process Hearing", in response to the lien notice.  In the attachment to Form 12153, Mr. Tucker expressed his desire for an OIC in the CDP context by stating that "on July 29, 2004, the taxpayer mailed to the IRS an offer in compromise covering these taxes and taxes for the years 1999 and 2003.  An offer in compromise would be the sensible collection alternative to this lien."  Because of the close timing of Mr. Tucker's submission of

---

[5]This August 2004 determination that Mr. Tucker could fully pay his income tax liabilities--a determination not important to the outcome of this case--was made by comparing Mr. Tucker's then-current liabilities (i.e., $35,591.26 with accruals through August 16, 2004) to his total ability to pay (which was reckoned to be $609,680.73).  Included in the IRS's calculation of Mr. Tucker's total ability to pay was $558,176.80 in dissipated assets from stock transactions, representing $697,721 discounted by 20 percent for quick sale purposes.  The $697,721 represents the largest amount of stock sales Mr. Tucker had, in the aggregate, on any one day (i.e., February 3, 2003).  We assume that the examiner concluded that if he had sales in that amount on that day, then he must have had cash in hand in that amount on that day; but if the examiner so concluded, she evidently failed to offset the proceeds by corresponding liabilities arising from margin purchases.  It seems unlikely that Mr. Tucker had $697,721 of proceeds from his day trading in hand at any one time.  In any event, before any determination was issued in this case, the OIC examiner abandoned the position that Mr. Tucker had dissipated $558,176.80 in stocks.  As is set out below, the Appeals Office subsequently determined that Mr. Tucker had dissipated assets in a much smaller amount--$22,645.

the July 2004 OIC and his August 2004 request for a CDP hearing, there was some confusion as to who (i.e., the original OIC examiner or the CDP settlement officer) should continue to consider Mr. Tucker's July 2004 OIC. As a result, there is some dispute as to whether Mr. Tucker ever disputed the financial determination outlined in the letter dated August 25, 2004, and whether his July 2004 OIC was rejected by the IRS before his case was assigned to a settlement officer. In any event, by letter dated May 19, 2005, from Mr. Tucker's counsel to the settlement officer assigned to Mr. Tucker's case, Mr. Tucker's counsel effectively withdrew Mr. Tucker's July 2004 OIC and indicated his desire for an installment agreement instead:

> Per your request, enclosed is the offer in compromise filed by Larry Tucker on July 29, 2004--i.e., prior to the IRS' issuance of collection due process notices.[6] I am also enclosing the Form 433-A filed at that time, together with its enclosures. Please note that we have since realized that the offer to pay $6,000 in the form of 60 monthly payments of $100 was a mistake in that the IRS requires that offers being paid in over two-year periods be payable over the entire collection period--which in this case is closer to ten years, since the offer was filed only a few months

---

[6]For clarification, Mr. Tucker's submission of the July 2004 OIC on July 29, 2004, was after the July 22, 2004, issuance of the lien notice by the IRS, but before Mr. Tucker received it. A "Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing" relating to tax years 1999 and 2003 was, in fact, issued after Mr. Tucker's submission of the July 2004 OIC. Section 6331(k)(1) provides for a restraint on levy while an OIC is pending, and the issuance of the notice of levy violated that restriction. As a result, the IRS withdrew this levy notice against Mr. Tucker. The issuance of that first levy notice (and its subsequent withdrawal) was not part of the CDP hearing or determination and is not part of the CDP appeal at issue here.

after the 2003 return was filed.  Mr. Tucker is willing to make payments over the entire collection period remaining.

    \*        \*        \*        \*        \*        \*        \*

* * * [Mr. Tucker's] income can be more variable than the usual taxpayer.  This may make an offer in compromise unfeasible, since a brief period of unemployment could result in the offer going into default and having to be completely redone.  Perhaps a more sensible situation would be for us together to determine a full or partial payment installment payment arrangement for Mr. Tucker, which might be modified in the future as his circumstances change.  Using the collection financial standards, we together could come to an amount. * * *

In this same letter, Mr. Tucker's counsel also addressed the issue that the original OIC examiner raised regarding dissipation of assets.  In doing so, Mr. Tucker's counsel referred the settlement officer to his letter dated April 26, 2005, which had been submitted to the Office of Appeals before the settlement officer was assigned to Mr. Tucker's case.  In that April 26, 2005, letter, Mr. Tucker's counsel had summarized Mr. Tucker's stock transactions as follows:

In January 2003, Mr. Tucker received payment in advance for some independent contractor web design project to be performed by him later in the year.  He knew he would need this money to live on during the year, but he also knew he owed taxes and other creditors.  In retrospect unwisely, he decided to try to leverage currently-unneeded funds[7] into profits by which he could pay off his back tax debts and

---

[7]Mr. Tucker's counsel characterized as "currently-unneeded" the funds that Mr. Tucker could have used to pay his overdue liabilities for the years 1999 through 2001.  Presumably he made that characterization because Mr. Tucker had not yet filed returns for those years.  If that was his reasoning, then it was not correct.  See the text accompanying note 12 below, discussing liabilities that were actually then due.

other creditors.  So, he wire transferred some of the funds from his checking account to a newly-opened E-Trade account between January 10, 2003 and April 3, 2003.  During January, he put $23,700 into the E-Trade account.  Then, he began day trading.  By the end of January, he showed a small profit, since the account was valued at $25,873.16 on January 31, 2003.  From there, however, everything went south.

The E-Trade account lost $7,123.12 in value in February 2003.  It continued losing money in March.  So, starting on March 13, 2003, Mr. Tucker received "margin calls". Mr. Tucker was trading on margin - i.e, borrowing part of the money to trade from the brokerage firm.  As the account declined in value, the brokerage firm insisted that Mr. Tucker put additional funds into the [E-Trade] account so that the margin borrowing did not exceed a certain percentage of the value of the account.  If Mr. Tucker did not comply with these "margin calls", the brokerage firm would sell all the stocks in the account.  So, from March 13, 2003 to April 3, 2003, Mr. Tucker put, in aggregate, $21,000 into the E-Trade account.

By mid-April, 2003, Mr. Tucker gave up on trading.  He had lost $22,645 through his trading between January 10 and April 21.  His last account position was liquidated on April 21, 2003.  At that point, the E-Trade account had about $22,000 in cash in it and no securities.  Between May 2, 2003 and October 27, 2003, Mr. Tucker gradually transferred money from the E-Trade account back to his checking account to pay his rent and other bills.  In all, he transferred $18,503 between accounts in that period.  At the same time, since the E-Trade account came with a debit card, he charged various personal expenses to thee-Trade [sic] account, approximating $3,500 in all.  By October 27, 2003, the account was left with only 79 cents in it.

So, <u>Mr. Tucker did not dissipate anywhere near the $697,721 determined by * * * [the original OIC examiner] - merely $22,645</u>.  And he did this in a good faith attempt to repay his taxes.  [Emphasis added.]

In her case activity records for May 27, 2005, the settlement officer observed:  "POA [i.e., Mr. Tucker's "power of attorney"] admits that at least $22,645.00 in assets was dissipated.  This amount must be added to RCP [reasonable collection potential].

I/A [installment agreement] might be more appropriate unless FP [full payment] is possible."

CDP hearing

The CDP hearing was held as a telephone conference on May 31, 2005, between the IRS settlement officer and Mr. Tucker and his counsel. During the conference Mr. Tucker's counsel reiterated that Mr. Tucker was no longer pursuing the July 2004 OIC proposing payments totaling $6,000 since circumstances had changed. Furthermore, Mr. Tucker's counsel advised that Mr. Tucker was not asserting that the lien filed against him had to be removed, but rather Mr. Tucker was hoping to find an installment payment arrangement that he could live with. Following the May 31 telephone CDP hearing, numerous letters were exchanged between the settlement officer and Mr. Tucker's counsel:

On June 8, 2005, Mr. Tucker submitted a revised page 6 of the Form 433-A to reflect new financial figures for his monthly income and expenses. This revised form demonstrated that Mr. Tucker had excess income over allowable living expenses of $326 per month. In the June 8, 2005, cover letter accompanying the updated financial information, Mr. Tucker's counsel advised the settlement officer that "Mr. Tucker would be prepared to enter into an installment payment arrangement to pay the IRS $326 a month." In response, by letter dated June 20, 2005, the

settlement officer concluded that her "calculations indicate that the most * * * [Mr. Tucker] would be able to pay is $316.00" per month. Enclosed with the settlement officer's letter was a Form 433-D, "Installment Agreement", filled out by the settlement officer reflecting a proposed partial payment installment agreement (PPIA) to pay $316 per month. The settlement officer invited Mr. Tucker to review the terms of the PPIA and, if acceptable, sign and return the agreement by July 6, 2005.

On June 23, 2005, Mr. Tucker's counsel faxed the settlement officer a letter indicating that Mr. Tucker would prefer an OIC in lieu of the proposed PPIA, because an OIC would (assuming he adhered to all of the conditions) fix his liability to the IRS, whereas the PPIA could be reexamined every two years for possible increases.[8]

---

[8]See sec. 6159(d) ("In the case of an agreement entered into by the Secretary * * * for partial collection of a tax liability [i.e., a PPIA], the Secretary shall review the agreement at least once every 2 years."); sec. 7122 (authorizing agreement between a taxpayer and the Government that fully settles a tax liability for payment of less than the full amount owed.) But see Internal Revenue Manual (IRM) pt. 5.8.6 (Sept. 1, 2005) (when accepting an OIC, the Government may obtain a collateral agreement that enables the Government to collect funds in addition to the amount actually secured by the offer). Certain provisions of the IRM have been revised since the time of Mr. Tucker's CDP hearing. We quote the IRM provisions as in effect when the Office of Appeals made the determination that is under review in this case.

Mr. Tucker's July 2005 OIC

Consistent with the suggestion he had made in his June 23 fax, Mr. Tucker's counsel sent to the settlement officer a revised OIC dated July 20, 2005. At that time Mr. Tucker's liabilities for the five years 1999 through 2003 totaled approximately $37,000 (with accruals).[9] Mr. Tucker proposed to settle his income tax liabilities for those five years by making a total of $36,772 in monthly payments of $317 over 116 months (July 2005 OIC). The offer of $317 per month was intended by Mr. Tucker to be $1 more than the settlement officer had previously determined he could pay per month (and was thus intended to exceed his RCP and thereby warrant acceptance). In a letter dated November 18, 2005, the settlement officer rejected Mr. Tucker's proposed July 2005 OIC. In doing so, the settlement officer stated, "It is usually not in the Government's best interest to accept an offer when there is more than five years remaining on the collection statute."

The notice of determination and the commencement of this case

On January 9, 2006, the Office of Appeals issued to Mr. Tucker a "Notice of Determination Concerning Collection

---

[9]The record reflects that Mr. Tucker's total outstanding tax liability with accruals through August 16, 2004, was $35,591.26, and his total liability with accruals through October 16, 2006, was $39,790.19. We therefore estimate his total outstanding liability as of July 20, 2005 (between those two dates), to be approximately $37,000.

Action(s) under Section 6320 and/or 6330", in which Appeals determined to uphold the filing of the NFTL as to Mr. Tucker's income tax liabilities for 2000, 2001, and 2002. In response, Mr. Tucker timely filed a petition with this Court on February 13, 2006.

Previous Tax Court proceedings, remand to the Office of Appeals, and supplemental notice of determination

After filing his petition, Mr. Tucker filed a motion for summary judgment on June 9, 2006. Respondent opposed that motion and filed a motion for remand on July 17, 2006, stating that "[t]he settlement officer erred as a matter of law in rejecting petitioner's offer for the stated reason that amendment of I.R.C. § 6159 to permit partial payment installment agreements renders obsolete deferred payment offers in compromise." By our order of July 27, 2006, we denied Mr. Tucker's motion for summary judgment and granted respondent's motion to remand the case to the IRS's Office of Appeals "for an officer to exercise discretion in consideration of * * * [Mr. Tucker's] offer" and for issuance of a supplemental notice of determination no later than October 16, 2006.

The Office of Appeals then assigned a settlement officer (i.e., a different settlement officer from the one who had conducted Mr. Tucker's initial CDP hearing) to conduct a supplemental CDP hearing and to reconsider Mr. Tucker's July 2005 OIC. The supplemental CDP hearing was held as a telephone

conference on September 11, 2006, between the settlement officer and Mr. Tucker's counsel.  On September 12, 2006, the Office of Appeals issued a "Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330", which determined to reject Mr. Tucker's July 2005 OIC and to uphold the filing of the NFTL as to Mr. Tucker's income tax liabilities for 2000, 2001, and 2002.  The attachment to the supplemental notice of determination stated, inter alia:

**Issues Raised by the Taxpayer**

In an attachment to Form 12153, * * * [counsel] stated that you were unable to full pay the balances due based on sporadic employment and medical concerns and believe that an offer in compromise would be a sensible alternative to the lien.  You submitted a long term deferred offer in the amount of $6,000.00 to compromise 1999, 2000, 2001, 2002, and 2003 1040 return balances.  You subsequently amended your offer to $36,772.00.  You owe $39,790.19 with accruals to 10/16/2006.

In response:

1.   An offer is not an alternative to the filing of a NFTL. It is an alternative to the issuance of a levy or garnishment.  Internal Revenue Manual (IRM) Section 5.8.4.9 requires that a NFTL be considered when reviewing an offer in compromise.  This section does not require the filing of a NFTL but they are routinely filed on offers that have been accepted but will not be paid within 24 months in order to protect the government's interest in any assets an individual may own.  Your proposal includes payments over the course of 116 months.

2.   NFTL may not be released until full payment is received.  A taxpayer may qualify for a withdrawal under circumstances laid out in IRC Section 6323(j) if the filing of the lien was premature or otherwise not in accordance with legal and administrative procedures, at the time a taxpayer entered into an installment agreement, he or she was not notified that a lien would be filed, withdrawal of

the lien would facilitate collection, and hardship situations (this determination is normally made by the Taxpayer Advocate rather than Appeals). As stated above, all legal or procedural requirements have been met. You have no installment agreement precluding the filing of the NFTL. The documents in the administrative file indicate that you want to pay the debts over 116 months based on your income. You site [sic] no other sources for funding the offer. Therefore, withdrawal of the lien would not facilitate collection by, for example, enabling you to get a loan to full pay the balance or gain business to speed up collection. Furthermore, in the response to the motion for summary judgment, you indicated that you did not request the NFTL be "removed".

3. Internal Revenue Manual (IRM) Section 5.8.1.4(1) lists four objectives of the offer in compromise program including to effect collection of what can reasonably be collected at the earliest possible time and at the least cost to the government, achieve a resolution that is in the best interest of both the individual taxpayer and the government, provide a taxpayer a fresh start toward future voluntary compliance with all filing and paying requirements, and secure collection of revenue that may not be collected through any other means. * * * [The previous settlement officer] offered to negotiate a shorter term offer that would accomplish all these objectives. A long term deferred offer may also accomplish these objectives but it also raises the possibility of a part payment installment agreement (PPIA). Appeals is required to consider all collection alternatives raised but is not required to accept an alternative that it believes will not be in the best interest of the taxpayer AND the government (emphasis added).

4. Appeals still does not believe a long term deferred offer is a better alternative to a PPIA because the Service still has to collect and monitor payments for the next 116 months and unlike a long term deferred offer, the payments on a PPIA are negotiable. IRS Section 6159 requires that PPIAs be reviewed every two years. If there are increases to a taxpayer's income or equity in assets, then the taxpayer is required to increase the amount of the payments, liquidate the equity, and if the income and equity is sufficient enough, full pay the debts. If the taxpayer does not comply, the Service can terminate the PPIA. The bottom line, in the amount of time it takes to monitor your long term deferred offer, the Service can review a PPIA no less

than four times, which may in fact result in an amount greater than what is offered and even full payment.

5.    There is reason to believe the Service would collect more from a PPIA over the next 116 months based on the documentation in the administrative file and information available from internal sources.  You are 45-years old, your diabetes is being controlled by medication and you are not receiving disability for this or any other ailments, and you are gainfully employed.  Your employment history also indicates you have the ability to earn great sums of money.  For instance, in 2003, you purchased and sold almost $7 million in stocks (you purchased more than $3.4 million in stocks and sold just about the same amount for which you ultimately claimed a loss on your 2003 1040 return).

6.    Upon review, * * * [this settlement officer] believes that the stock sales are dissipated assets and believes the amounts dissipated should be included in a minimum offer calculation.  As such, the minimum offer is actually full payment.  These stock transactions in 2003 occurred * * * [after] the due dates of the 1999, 2000, and 2001 1040 returns.  If you simply sold a little less than you bought, which was your option, you could have already paid the taxes in full.

Mr. Tucker's motion to remand and the parties' cross-motions for summary judgment

On November 21, 2006, in response to the supplemental notice of determination, Mr. Tucker filed an amendment to petition with this Court in order to challenge the determination in the supplemental notice of determination.  In his amendment to petition, Mr. Tucker asserted that the Office of Appeals erred by:  (1) determining that Mr. Tucker's offer was not in respondent's best interest; (2) determining that a PPIA was a better alternative to the OIC that Mr. Tucker proposed; (3) determining that there was reason to believe that Mr. Tucker's income or assets would increase in the future, such

that the IRS would collect more from a PPIA than from the OIC; (4) determining that Mr. Tucker's stock sales in 2003 constituted "dissipated assets"; (5) raising the dissipated assets issue in the supplemental notice of determination because it went beyond the scope of the remand order, as the issue was not raised in the original notice of determination; (6) determining that "there is no law or policy that requires the Service to accept an offer"; and (7) determining that "the cost it takes to monitor your long term deferred offer for 116 months would be similar to the cost it would take to monitor a part payment installment agreement".[10]

On November 29, 2007, respondent filed a motion for summary judgment asking the Court to sustain the supplemental notice of determination. Mr. Tucker filed a cross-motion for summary judgment on February 27, 2008, and filed a motion for remand on September 2, 2008. Mr. Tucker's motion to remand was previously denied in Tucker v. Commissioner, 135 T.C. 114 (2010), and we now address the parties' cross-motions for summary judgment.

---

[10]Mr. Tucker also contended that the Office of Appeals failed to afford him his statutory right to a hearing, in that he was denied a hearing before an appeals officer appointed pursuant to the Appointments Clause in Article II of the Constitution. We rejected this contention in Tucker v. Commissioner, 135 T.C. 114 (2010).

Discussion

I.  Applicable legal principles

    A.  Summary judgment standards

Where the pertinent facts are not in dispute, a party may move for summary judgment to expedite the litigation and avoid an unnecessary trial.  Summary judgment may be granted where there is no genuine issue as to any material fact and a decision may be rendered as a matter of law.  Rule 121(a) and (b).  Since we will grant respondent's motion for summary judgment, we will focus on respondent as the movant.  The party moving for summary judgment (i.e., respondent) bears the burden of showing that there is no genuine issue as to any material fact, and factual inferences will be drawn in the manner most favorable to the party opposing summary judgment (i.e., Mr. Tucker).  Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

    B.  Collection review procedure

When a taxpayer fails to pay any Federal income tax liability after demand section 6321 imposes a lien in favor of the United States on all the property of the deliquent taxpayer, and section 6323 authorizes the IRS to file notice of that lien.  However, the IRS must provide written notice of a tax lien filing to the taxpayer within five business days.  After receiving such a notice, the taxpayer may request an administrative hearing before the Office of Appeals.  Sec. 6320(a)(3)(B), (b)(1).

Administrative review is carried out by way of a hearing before
the Office of Appeals pursuant to section 6330(b) and (c); and,
if the taxpayer is dissatisfied with the outcome there, he can
appeal that determination to the Tax Court under section 6330(d),
as Mr. Tucker has done.

For the agency-level CDP hearing before the Office of
Appeals, the pertinent procedures are set forth in section
6330(c):

First, the IRS appeals officer must obtain verification from
the Secretary that the requirements of any applicable law or
administrative procedure have been met.  Sec. 6330(c)(1).[11]  The
supplemental notice of determination and respondent's motion set
forth the IRS's compliance with these requirements; however, in
his petition at paragraph 4(m) and (n), Mr. Tucker called into
question the accuracy of the filing date of the NFTL reflected on
the lien notice:

m.    On July 13, 2004, respondent prepared a notice of
      federal tax lien against petitioner for his 2000, 2001,
      and 2002 taxes.  Respondent filed the notice of federal
      tax lien in Manhattan on August 4, 2004.

n.    On July 22, 2004, respondent issued to petitioner a
      "Notice of Federal Tax Lien Filing and Your Right to a

---

[11]In the case of the lien filed against Mr. Tucker, the
basic requirements, see sec. 6320, for which the appeals officer
was to obtain verification are:  a timely assessment of the
liability, secs. 6201(a)(1), 6501(a); notice and demand for
payment of the liability, sec. 6303; and notice of the filing of
the lien and of the taxpayer's right to a CDP hearing, sec.
6320(a) and (b).

Hearing Under IRC 6320" for the years 2000, 2001, and 2002, erroneously stating that the Notice of Federal Tax Lien had been filed on July 15, 2004.

While Mr. Tucker concedes that the IRS issued to him a lien notice for tax years 2000, 2001, and 2002 on July 22, 2004, he disputes whether the NFTL was filed on July 15, 2004 (as reflected in the lien notice), or August 4, 2004 (as reflected on the website of the New York City Department of Finance).  We find it unnecessary to resolve this issue, for the following reasons.

Under section 6320(a), the Secretary is required to send written notice to the taxpayer liable for the tax "not more than 5 business days after the day of the filing of the notice of lien."  Whether the NFTL was filed on July 15, 2004, or August 4, 2004, the IRS sent notice of the filing to Mr. Tucker on July 22, 2004, which was "not more than 5 business days after" July 15, 2004, or August 4, 2004.  There is no rule that the requisite notice cannot be sent before the filing of the NFTL.  Therefore, even if the NFTL was filed on August 4, 2004, the lien notice that Mr. Tucker received on July 22, 2004, was still timely under section 6320(a).  Mr. Tucker has raised no other verification issues under section 6330(c)(1), and we find no failure of verification.

Second, the taxpayer may "raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy," including challenges to the appropriateness of the collection action and

offers of collection alternatives.  Sec. 6330(c)(2)(A).

Mr. Tucker's principal contention--that the IRS Office of Appeals abused its discretion in not accepting his OIC--pertains to that second set of issues, which we will discuss below.

Additionally, the taxpayer may contest the existence and amount of the underlying tax liability if he did not receive a notice of deficiency or otherwise have a prior opportunity to dispute the tax liability.  Sec. 6330(c)(2)(B).  While Mr. Tucker did not have any prior opportunity to challenge his underlying self-reported liabilities, he did not make such a challenge during his CDP hearing or before this Court.  Therefore, we find Mr. Tucker's underlying tax liabilities for 2000, 2001, and 2002 are not at issue.

When the Office of Appeals issues its determination, the taxpayer may "appeal such determination to the Tax Court", pursuant to section 6330(d)(1), as Mr. Tucker has done.  In such an appeal (where the underlying liability is not at issue), we review the determination of the Office of Appeals for abuse of discretion.  That is, we decide whether the determination was arbitrary, capricious, or without sound basis in fact or law. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), affd. 469 F.3d 27 (1st Cir. 2006); Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176 (2000).  Because Mr. Tucker does not dispute the filing of the NFTL as improper,

our review of the supplemental notice of determination focuses on whether the Office of Appeals abused its discretion in rejecting Mr. Tucker's OIC.

II.  Respondent's entitlement to summary judgment

      A.  Scope of remand

Mr. Tucker argues that the settlement officer assigned to his supplemental CDP hearing erred in raising the dissipated assets issue in the supplemental notice of determination because it went beyond the scope of the remand order, as the issue was not raised in the original notice of determination.  As a result, we must decide whether it was proper for the settlement officer to include dissipated assets in her calculation of Mr. Tucker's reasonable collection potential.  We hold that it was proper for her to do so.

Section 6330(c)(2)(A)(iii) permits a taxpayer to propose collection alternatives to the filing of a Federal tax lien. Section 4.02(2) of Rev. Proc. 2003-71, 2003-2 C.B. 517, 517, provides that an OIC based on doubt as to collectibility will be treated as an acceptable collection alternative only where the OIC reflects the taxpayer's reasonable collection potential. Where a taxpayer has dissipated assets in disregard of the taxpayer's outstanding Federal income taxes, the dissipated assets may be included in the calculation of the minimum amount

that is to be paid under an acceptable OIC.  Internal Revenue Manual (IRM) pt. 5.8.5.4(5) (Sept. 1, 2005).

Mr. Tucker is not correct in asserting that the dissipation issue was not considered by the original settlement officer and not raised in the original notice of determination.  While the original settlement officer did not articulate her reasons for denying Mr. Tucker's OIC (thereby necessitating the remand), her case activity notes clearly reflect that she considered the issue of dissipation:  "POA admits that at least $22,645.00 in assets was dissipated.  This amount must be added to RCP.  I/A might be more appropriate unless FP is possible."

In any event, we do not believe the second settlement officer's review was limited to issues raised in the original notice of determination.  By its order of July 27, 2006, this Court granted respondent's motion to remand this case to the IRS's Office of Appeals "for an officer to exercise discretion in consideration of * * * [Mr. Tucker's] offer".  We thus ordered the Office of Appeals to consider Mr. Tucker's OIC de novo.  To do so, the settlement officer was required pursuant to IRM pt. 5.8.5.4 to consider any dissipated assets in calculating Mr. Tucker's reasonable collection potential.  Since the viability of an OIC is contingent on a taxpayer's reasonable collection potential, we find that inherent in the consideration of Mr. Tucker's OIC was the consideration of dissipated assets.

As a result, we hold that the issue of dissipated assets was properly considered by the settlement officer during the supplemental CDP hearing, and that consideration of that issue did not go beyond the scope of our remand order.

B.   Dissipation of assets

Mr. Tucker also argues that the Office of Appeals erred in determining that his day trading in 2003 constituted a dissipation of assets.   We disagree in part.

A dissipated asset is defined as any asset (liquid or not liquid) that has been sold, transferred, or spent on nonpriority items or debts and that is no longer available to pay the tax liability.   Samuel v. Commissioner, T.C. Memo. 2007-312; IRM pt. 5.8.5.4(1).   If the OIC examiner determines that assets have been dissipated with a disregard of an outstanding tax liability, then the examiner may include the value of the dissipated asset in the taxpayer's reasonable collection potential calculation.   IRM pt. 5.8.5.4 states:

> (1) During an offer investigation it may be discovered that assets (liquid or non-liquid) have been sold, gifted, transferred, or spent on non-priority items and/or debts and are no longer available to pay the tax liability.   This section discusses treatment of the value of these assets when considering an offer in compromise.
>
> *       *       *       *       *       *       *
>
> (2)   Once it is determined that a specific asset has been dissipated, the investigation should address whether the value of the asset, or a portion of the value, should be included in an acceptable offer amount.

\* \* \* \* \* \* \*

(5)  If the investigation clearly reveals that assets have been dissipated with a disregard of the outstanding tax liability, consider including the value in the reasonable collection potential (RCP) calculation.

Where a taxpayer's once-held assets have simply vanished, it makes obvious sense for the tax collector to include the assets in computing the taxpayer's reasonable collection potential, unless the taxpayer can account for them.  See Schropp v. Commissioner, T.C. Memo. 2010-71, slip op. at 24-26, affd. without published opinion 106 AFTR 2d 2010-7424, 2011-1 USTC par. 50,122 (4th Cir. 2010).  However, where a taxpayer can prove that he really did dissipate the assets (say, by lavish living or gambling that he substantiates), the long-gone assets cannot be said to increase his literal collection potential.  However, in that circumstance the IRM nonetheless instructs the Office of Appeals to "consider" including the assets in RCP.  The evident reason for this rule is to deter delinquent taxpayers from wasting money that they owe and should pay as taxes. Conscientious taxpayers would object--and the system would suffer--if a noncompliant taxpayer with overdue taxes and with money in hand could spend his money on "non-priority items" and nonetheless effectively obtain forgiveness of his liability simply by proving in the collection context that he really did reduce his collection potential by wasting the assets.  Removing dissipated assets from "reasonable collection potential" could

create perverse incentives, and the tax collector must have discretion to avoid that problem.

Mr. Tucker admittedly deposited $23,700 into an E-Trade account in January 2003 and made additional deposits totaling $21,000 between March 13 and April 3, 2003. At the time Mr. Tucker admittedly deposited funds into his E-Trade account (i.e., from January to April 3, 2003), he had not yet filed his income tax returns for tax years 1999 through 2001, which were then due. Nonetheless, because the due date for those returns had passed, his tax liabilities had accrued and he had outstanding tax liabilities (not including any interest or additions to tax) for tax years 1999, 2000, and 2001 totaling $14,945 at the time of his deposits.[12] Personal income taxes are due on the date the return is required to be filed. Sec. 6151(a); Holywell Corp. v. Smith, 503 U.S. 47, 58 (1992); Pan Am. Van Lines v. United States, 607 F.2d 1299, 1301 (9th Cir. 1979). Mr. Tucker's tax liabilities for tax years 2002 and 2003 had not yet accrued. Mr. Tucker was aware of his unpaid tax obligations for 1999 through 2001 when he transferred the $44,700 into his E-Trade account. Despite having known tax obligations, Mr. Tucker still transferred the money and for nearly four months engaged in the highly speculative and volatile activity of day trading.

---

[12]The liabilities eventually reported on his returns but not prepaid by withholding or otherwise were $3,356 for 1999, $8,106 for 2000, and $3,483 for 2001, totaling $14,945. See supra p. 5.

Mr. Tucker maintains that he did so in an effort to make enough money to pay off his delinquent taxes and other creditors, as well as pay his tax liability for 2002 that would be coming due. Even if this is true, Mr. Tucker's motives do not change the character of his day trading activity.

Black's Law Dictionary (8th ed. 2004) defines "day trading" as "The act or practice of buying and selling stock shares or other securities on the same day, esp. over the Internet, usu. for the purpose of making a quick profit on the difference between the buying price and the selling price." Mr. Tucker had never owned stocks before and had no experience in day trading. To further complicate matters, Mr. Tucker was trading on margin-- i.e., was borrowing part of the money to trade from a brokerage firm--and was making high-volume trades (e.g., trading as much as $697,721 in one day).

On April 21, 2003, Mr. Tucker stopped trading. By that time he had lost $22,645 of his initial deposits, leaving approximately $22,000 in the E-Trade account. Mr. Tucker maintains that he used this remaining $22,000 to provide for basic living expenses from May 2 through October 27, 2003. Under Rule 121 we view the facts in the light most favorable to Mr. Tucker, and we assume that the $22,000 was, in fact, used for

necessary living expenses.[13]  Pursuant to IRS administrative guidelines, if this $22,000 was used for necessary living expenses, it will not be considered a dissipation.  IRM pt. 5.8.5.4(4) ("When the taxpayer can show that assets have been dissipated to provide for necessary living expenses, these amounts should <u>not</u> be included in the reasonable collection potential (RCP) calculation").  We therefore consider as potential dissipation only the other $22,645, which Mr. Tucker lost.

The losses that Mr. Tucker sustained were not due to an unforeseeable event but rather were commonplace (especially for a neophyte) in such a highly volatile activity.  Mr. Tucker knew he owed outstanding taxes; and he had the cash in hand that would have paid in full the taxes and accruals he owed as of early 2003 (i.e., for tax years 1999, 2000 and 2001); and yet he chose instead to devote that money to a risky investment.  Mr. Tucker's foray into day trading was purely speculative, and his already slim chances of success were undermined by his inexperience.  In short, Mr. Tucker's circumstances were of his own making.

_____

[13]This assumption may be unduly generous, since Mr. Tucker admits that some portion of this $22,000 may not have been used for necessary living expenses--e.g., $824.64 on May 19, 2003, for an airline ticket for a personal trip to Phoenix, Arizona; $274.84 on June 2, 2003, for the hotel stay associated with this personal trip; $535 on October 24, 2003, for a bartending course; and $236 on August 12, 2003, for a personal cruise on the Hudson River.

Therefore, we cannot criticize the Office of Appeals' conclusion that Mr. Tucker's losses associated with his day trading were a dissipation of assets that should be considered for inclusion in RCP as contemplated by IRM pt. 5.8.5.4.

In the supplemental notice of determination, the settlement officer concluded that Mr. Tucker had dissipated $44,700 in assets, measured by his deposits into the E-Trade account. For purposes of summary judgment, we find that that conclusion was excessive. The mere act of depositing the money into the E-Trade account did not rise to the level of dissipation, but the day trading and the losing of the money in the account did. Because at the time in April 2003 that Mr. Tucker lost a total of $22,645 from his day trading activities, he had outstanding Federal tax liabilities of at least $14,975,[14] we hold for purposes of summary judgment that Mr. Tucker dissipated assets of $14,975.

The settlement officer determined that not just $14,975 but rather all $44,700 of the deposits had been dissipated. For

---

[14]The record does not provide a basis for the Court to reasonably estimate Mr. Tucker's unpaid tax liabilities with accruals as of April 2003. As a result, for summary judgment purposes, we assume Mr. Tucker's unpaid tax liabilities to be the amounts reported as due when he filed his delinquent returns for tax years 1999, 2000, and 2001. Furthermore, although Mr. Tucker's tax liability for tax year 2002 accrued on April 15, 2003--the due date of the return--we cannot tell on the record before us whether the losses associated with the E-Trade account occurred before or after April 15, 2003. As a result, for summary judgment purposes we ignore the tax liability for 2002 in determining Mr. Tucker's outstanding tax liabilities at the time he dissipated assets.

purposes of summary judgment, we assume that conclusion was erroneous as to amount, but we find that error to be harmless for reasons explained below. See infra note 16. As a result, we conclude that the settlement officer did not abuse her discretion in determining that Mr. Tucker had dissipated assets as the result of his day trading in 2003.

     C.   Rejection of Mr. Tucker's OIC

The Office of Appeals rejected Mr. Tucker's OIC because, inter alia, it determined that he could fully pay his tax liabilities. At the time of the supplemental notice of determination, Mr. Tucker owed $39,790.19 (with accruals through October 16, 2006) in unpaid Federal income taxes for the years 1999 through 2003. The settlement officer assigned to Mr. Tucker's supplemental CDP hearing was tasked with considering Mr. Tucker's proposed OIC of $36,772 (to be paid at a rate of $317 per month over 116 months) based on doubt as to collectibility.

       1.   Mr. Tucker's dissipation of assets justified the rejection of his OIC.

Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517, provides that an OIC based on doubt as to collectibility will be treated as an acceptable collection alternative only where the OIC reflects the taxpayer's reasonable collection potential. A taxpayer's reasonable collection potential is determined, in part, using published guidelines that establish national and

local allowances for necessary living expenses. Income and assets (possibly including dissipated assets in accordance with IRM pt. 5.8.5.4) in excess of those needed for necessary living expenses are treated as available to satisfy Federal income tax liabilities. See IRM pt. 5.15.1.2(1) and (2) (May 1, 2004); IRM exs. 5.15.1-3, 5.15.1-8, 5.15.1-9 (Jan. 1, 2005).

The parties agree that Mr. Tucker's disposable income (i.e., monthly income over allowable monthly expenses) was $316 per month, and that there were 116 months remaining before his collection period expiration date. See sec. 6502. "Generally, the amount to be collected from future income is calculated by taking the projected gross monthly income less allowable expenses and multiplying the difference times the number of months remaining on the statutory period for collection." IRM pt. 5.8.5.5.5(1) (Sept. 1, 2005). As a result, Mr. Tucker's future income subject to collection would be $316 x 116 months, or $36,656[15]--an amount slightly <u>less</u> than the total of the payments he proposed in his OIC.

However, as we determined above, the value of assets that Mr. Tucker dissipated through his day trading activities was $14,945. Under IRS guidelines, Mr. Tucker's reasonable

---

[15]In calculating a taxpayer's future income stream for purposes of evaluating a offer, the IRM apparently does not direct settlement officers to discount the monthly income stream to a present value.

collection potential would therefore be $51,601--i.e., the sum of his future income stream ($36,656) <u>plus</u> the value of any dissipated assets (at least $14,945).  Given that Mr. Tucker's reasonable collection potential thus exceeded his outstanding tax liabilities, the settlement officer did not err in determining Mr. Tucker could fully pay his Federal income tax liabilities.[16] When an Appeals officer has followed IRS administrative guidelines to ascertain a taxpayer's reasonable collection potential and has rejected the taxpayer's OIC on that ground, we generally have found no abuse of discretion.  See <u>McClanahan v. Commissioner</u>, T.C. Memo. 2008-161.

2.  <u>Even apart from Mr. Tucker's dissipation of assets, the Office of Appeals did not abuse its discretion in rejecting his OIC</u>.

Assuming arguendo that we should ignore dissipated assets altogether and should conclude that Mr. Tucker's reasonable collection potential was <u>less</u> than full payment, we still hold that the Office of Appeals did not abuse its discretion in rejecting Mr. Tucker's OIC and insisting instead on a PPIA, for the following reasons.

Section 7122(a) authorizes compromise of a taxpayer's Federal income tax liability.  "'The decision to entertain,

---

[16]We find the settlement officer's inclusion of $44,700 of dissipated assets in Mr. Tucker's reasonable collection potential (as opposed to the $14,945 determined above) to be a harmless error because--as is shown above--even with inclusion of only the lower amount, Mr. Tucker could still fully pay his liabilities.

accept or reject an offer in compromise is squarely within the discretion of the appeals officer and the IRS in general.'" Gregg v. Commissioner, T.C. Memo. 2009-19 (quoting Kindred v. Commissioner, 454 F.3d 688, 696 (7th Cir. 2006)). In reviewing this determination, we do not decide whether in our opinion Mr. Tucker's OIC should have been accepted. See Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Keller v. Commissioner, T.C. Memo. 2006-166, affd. in part 568 F.3d 710 (9th Cir. 2009). Instead, we review the determination for abuse of discretion.

As Mr. Tucker's representative acknowledged, an OIC permanently limits the Government to collecting only according to its terms, whereas a PPIA permits the Government to review the taxpayer's situation every two years and increase its collections if circumstances warrant. See supra note 8. In the supplemental notice of determination, the settlement officer articulated several reasons for her determination, largely on the basis of this distinction: (1) Mr. Tucker's offer was not in the best interest of the Government; (2) a PPIA was a better alternative to the OIC that Mr. Tucker proposed; (3) there is reason to believe that Mr. Tucker's income or assets would increase in the future, such that the IRS would collect more from a PPIA than from the OIC; (4) "there is no law or policy that requires the Service to accept an offer"; and (5) "the cost it takes to monitor * * * [Mr. Tucker's] long term deferred offer for 116

months would be similar to the cost it would take to monitor a part payment installment agreement". The decision whether to accept Mr. Tucker's OIC rested squarely within the discretion of the settlement officer, and we find there was a reasonable basis for the settlement officer's decision; it was not arbitrary, capricious, or without sound basis in fact or law. As a result, we cannot conclude that the Office of Appeals abused its discretion in rejecting Mr. Tucker's OIC and sustaining the filing of the NFTL, whether or not dissipated assets were considered by the settlement officer or included in his RCP.

### Conclusion

On the basis of the foregoing, we conclude that the Office of Appeals did not abuse its discretion, and we hold that respondent is entitled to the entry of a decision sustaining the determination as a matter of law.

To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.