T.C. Memo. 2012-39

UNITED STATES TAX COURT

MARK A. LEAGO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13070-08L.                    Filed February 9, 2012.

Mark A. Leago, pro se.

<u>Susan Kathy Greene</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Pursuant to section 6330(d) petitioner appeals

respondent's determination and supplemental determination to proceed by levy to

collect petitioner's unpaid employment taxes, including Federal Insurance Contributions Act taxes, with respect to Forms 941, Employer's Quarterly Federal Tax Return, for the taxable quarters ending March 31, June 30, September 30, and December 31, 1995, and December 31, 1996 (employment taxes); and to collect by levy petitioner's unpaid tax liabilities with respect to Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, for taxable year 1996.[1]

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate by this reference. Petitioner resided in Texas when he filed his petition.

From 1993 to 1996 petitioner owned and operated, as a sole proprietorship, a video rental business with several employees. He failed to file Forms 941 for the taxable quarters ending March 31, June 30, September 30, December 31, 1995, and December 31, 1996, and failed to file Form 940 for taxable year 1996.

On August 12, 1998, respondent sent petitioner Letters 950, proposing deficiencies totaling $21,621 for the unpaid employment and FUTA taxes and additions to tax for failure to timely file and failure to make deposits of taxes. On August 9, 1999, respondent assessed these liabilities plus statutory interest.

---

[1] All section references are to the Internal Revenue Code in effect at all relevant times. All monetary amounts are rounded to the nearest dollar.

On February 7, 2007, respondent sent petitioner Letter 1058, Final Notice--

Notice of Intent to Levy and Notice of Your Right to a Hearing, with respect to the

assessed liabilities.  On March 2, 2007, respondent received from petitioner a timely

Form 12153, Request for a Collection Due Process or Equivalent Hearing.  On the

Form 12153 petitioner indicated, among other things, that he disagreed with the

assessment and that he had health problems and financial hardship.  In a letter

attached to the Form 12153, petitioner indicated that he had lost his business

records for the periods at issue but believed he had already paid the taxes.  The

letter stated:

> I am also experiencing physical and financial hardship.  I was
> diagnosed last year with an acoustic neuroma brain tumor, this is a life
> threatening illness.  I experienced severe symptoms, including
> headaches, vertigo, loss of balance, tinnitus, cloudy thinking, memory
> loss, depression and others.  For several months, I could barely get out
> of bed and rarely able to leave the apartment, and when I did it was
> with much difficulty.  Recently I have begun to feel better on many
> days, some symptoms remain, and some days they all come back and
> leave me unable to get out of bed.  This condition does not allow me to
> be gainfully employed full time.  However, I can sometimes still work
> on real estate investments.  I will not be as effective if I were not sick,
> but hopeful that I will soon be able to get a brain operation to solve my
> health problems.
>
> I am requesting the IRS to delay the Levy and Collection process until,
> that it can be fairly determined how much taxes, if any, that I do indeed
> owe to the IRS and until my health is restored, so that I can be self-
> reliant and fulfill any financial obligations that I may have.

On May 29, 2007, respondent's settlement officer held a telephone collection due process (CDP) hearing with petitioner. Although petitioner initially questioned his underlying liability, after discussing the issue with the settlement officer, he stated that he no longer disputed it. Petitioner requested that his accounts for the unpaid taxes in question be closed as currently not collectible because of financial hardship and health problems. According to the settlement officer's log, petitioner stated that he was diagnosed with a brain tumor in June 2006. The log states: "He needs surgery but does not have the funds for the sugery [sic]. He has no assets, lives in an apt and a friend gives him the funds to meet his necessary living expenses. * * * If he had the money he would have the surgery done, that was his first priority." The settlement officer requested that petitioner submit various information, including a current doctor's statement, a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and the last six months of his bank statements.

In response to this request, on June 12, 2007, the settlement officer received from petitioner letters from two doctors and a hospital. One of the letters, dated July 28, 2006, from Dr. Todd W. Trask in the Department of Neurosurgery at Methodist Neurological Institute, indicated that petitioner had an acoustic neuroma that caused him severe vertigo and hearing loss. The letter stated: "It is

absolutely necessary for this tumour to be treated. Our recommendation is for microsurgical excision * * * to be done as soon as possible."

Another letter, dated August 2, 2006, from Dr. Jeffrey T. Vrabec at the Baylor College of Medicine indicated that petitioner was a patient under his care who recently had been diagnosed with an acoustic neuroma and that a sigmoid craniotomy was recommended to remove the tumor. This letter indicated that both Dr. Vrabec and Dr. Trask would perform the surgery and that the total hospitalization would average four to five days, with 24-48 hours in the neuro intensive care unit. The letter indicated that petitioner was without insurance and was asking for financial aid for the surgery.

Petitioner also submitted a letter dated February 9, 2007, from The Methodist Hospital, Houston, Texas, stating that his request for charity care had been declined because his income exceeded eligibility criteria.

On June 12, 2007, the settlement officer also received from petitioner, as requested, a Form 433-A and bank statements. The Form 433-A indicated that petitioner had zero monthly income. The bank statements indicated that between November 2006 and May 2007 there had been monthly deposits into his checking

account totaling \$13,800.[2] Petitioner also submitted unsigned and unfiled Forms 1040, U.S. Individual Income Tax Return, for taxable years 2004 and 2005, which listed petitioner's occupation as "real estate". These returns indicated that during 2004 petitioner had sold certain property, generating installment sale income of \$41,000 in 2004 and \$125,618 in 2005.

On July 18, 2007, the settlement officer and petitioner spoke by telephone and discussed his financial information and medical condition. The settlement officer's log states in part: "Medical-Need current statements from doctors. He [petitioner] had a heated argument with the SO [settlement officer] stating he did not want to go back to the doctor as he could not afford the surgery requested. Informed him that I needed a current prognosis especially since he has had income for the last three tax years."

On May 1, 2008, respondent issued to petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, sustaining the proposed levy. The determination was based in part on petitioner's failure to file Federal income tax returns and make payments for the taxable years 2004, 2005, and 2006.

---

[2]Petitioner advised the settlement officer that these deposits represented sums that a friend lent him each month so that he could pay living expenses.

Petitioner filed a petition with this Court, challenging this determination. On June 25, 2009, when the case was called for trial, petitioner appeared and represented that he was in ill health, needed a $100,000 operation to remove his acoustic neuroma, had no health insurance, and was broke. Respondent's counsel indicated that after the notice of determination had been issued, petitioner had filed his delinquent income tax returns but that the Internal Revenue Service (IRS) had not yet reviewed them to determine whether his account should be placed in currently not collectible status. The Court remanded the case to respondent's Appeals Office for further consideration of whether petitioner qualified for any collection alternative or whether the tax liabilities at issue were currently not collectible.

On June 29, 2009, petitioner telephoned the settlement officer, who advised him to start preparing a new Form 433-A. A supplemental CDP hearing was scheduled for September 22, 2009. On August 20, 2009, the settlement officer received from petitioner a Form 433-A and a copy of his unfiled 2008 income tax return. The Form 433-A, dated June 25, 2009, showed that petitioner had zero monthly income and estimated monthly living expenses of $5,848, which included $400 for health insurance but no amount for out-of-pocket health care costs, which were indicated by a question mark. After submitting this Form 433-A, petitioner

started working as an independent contractor, collecting lead for a green energy company. On August 25, 2009, petitioner submitted an amended Form 433-A showing total monthly income of $3,010 and total monthly expenses of $3,787, including no amount for health insurance costs or out-of-pocket health care costs.

On September 22, 2009, the settlement officer spoke with petitioner by telephone. She advised him that he was ineligible for currently not collectible status because, according to her analysis, he had sufficient income to make payments toward his delinquent taxes. She offered petitioner a part-pay installment agreement that would require him to pay $200 per month toward his tax liabilities.[3] According to the settlement officer's log, this offer was intended "to enable him [petitioner] to get his health issues resolved. Once this issue is resolved the taxpayer may be in a position to renegotiate the agreement."

According to her log, in determining that petitioner could afford to pay $200 per month toward his tax liabilities, the settlement officer excluded any expenses for health care because "expenses that he [petitioner] was not paying for currently could not be allowed." But she did allow petitioner $190 per month for health insurance "due to his medical condition". According to the settlement officer's log, petitioner

[3]Under a part-pay installment agreement, petitioner's total tax liability would not be paid off before the expiration of the period of limitations for collection.

pleaded with her to "show leniency given his health situation and his brain tumor". When the settlement officer asked him whether he had been back to the doctor, petitioner responded by asking "if the mechanic informed him he had a transmission problem would he go back to the mechanic if he did not have the funds for the repairs". Petitioner declined the proposed part-pay installment agreement.

On September 23, 2009, the settlement officer sent petitioner a letter, enclosing a blank Form 656, Offer In Compromise, and her revised income and expense analysis. The letter indicates that the calculations are based on national and local standards and states: "I cannot allow expenses that you are not currently paying." The letter informed petitioner that he had not made estimated tax payments for 2009.

On November 2, 2009, petitioner submitted two money orders totaling $1,205 to be applied as estimated tax payments for 2009, a money order for $150 for the offer-in-compromise application fee, and a money order for $480 as an initial payment of his offer.

On November 4, 2009, the IRS received from petitioner a Form 656 offering to compromise the employment taxes that are at issue in this case as well as his unpaid Federal income taxes for tax years 2004 through 2008 (a total liability of

$94,433) for a cash payment of $2,400 to be paid in five installments.[4] Petitioner requested an offer-in-compromise based on doubt as to collectibility. Attached to the Form 656 was a statement for consideration of special circumstances. This statement indicated that in May 2006 petitioner had awakened with a noticeable hearing loss in his right ear and after various consultations with his doctors was diagnosed with an acoustic neuroma brain tumor. He indicated that his symptoms included "double vision, severe vertigo, cloudy thinking, tinnitus, depression, lack of energy, and a great deal of fear." He stated that these symptoms greatly reduced his income-earning potential. He indicated that the operation he needed was estimated to cost $100,000 and that he had no health insurance, no assets, and no savings. Attached to the Form 656 was a one-page typed list titled "Medical Surgery Expenses", listing expenses of $106,824 for his brain surgery but including no supporting documentation.

Along with the offer-in-compromise petitioner submitted an updated Form 433-A, which listed his total monthly income as $4,000 and his total monthly living expenses as $7,683, including monthly out-of-pocket health care expenses

---

[4]The offer-in-compromise identified the source of his proposed cash payments as an advance from the company for which he worked as an independent contractor: "THIS WOULD BE A LOAN THAT I WOULD WORK OFF IN THE FUTURE. AT SOME POINT I NEED TO FOCUS ON RESOLVING MY HEALTH PROBLEMS."

of $3,100, representing his estimate of future expenses for brain surgery. He also submitted a bank statement indicating that as of October 16, 2009, his checking account was overdrawn by $344.

On November 12, 2009, the settlement officer met with petitioner to discuss his offer-in-compromise. She presented him with a letter requesting that he provide, within a week, specified documentation, including verification of the $3,100 per month he had claimed as out-of-pocket health care costs. According to the settlement officer's log, petitioner advised the settlement officer that the claimed $3,100 per month of health care costs represented "payments [that] were for future expenses he would need to incur for surgery." The settlement officer responded that she "could not allow for future expenses that he may incur." According to the log, petitioner left the interviewing room stating: "You would rather I pay my taxes than have surgery."

In a letter to the settlement officer dated November 16, 2009, petitioner again stated: "My estimation for medical payments and out of pocket health care cost are a way of getting the cost of my necessary surgery in the record."

On November 18, 2009, petitioner met with the settlement officer and provided some of the requested information but no additional documentation for his estimated health care costs.

In a letter to petitioner dated November 19, 2009, the settlement officer advised him that the minimum amount for an acceptable offer-in-compromise was $13,152. Workpapers attached to this letter indicate that this number represented 48 times petitioner's monthly disposable income, which the settlement officer determined to be $274, representing the difference between his $4,000 monthly income and allowable monthly living expenses of $3,762.[5] In calculating petitioner's monthly living expenses the settlement officer allowed him $60 for out-of-pocket medical expenses and $200 for health care insurance, "based on the special medical circumstances claimed by the tax payer." The letter indicates that the settlement officer had disallowed petitioner's $3,100 claimed monthly allowance to allow him to save for future brain surgery because "the Settlement Officer was unable to understand how Mr. Leago could save an amount he did not have."

In a phone call with the settlement officer on December 11, 2009, petitioner disagreed with her determinations.

---

[5]In this letter the settlement officer found that petitioner's only known asset was his car, with an equity value of $3,118. In calculating the minimum amount for an acceptable offer from petitioner, the settlement officer excluded the equity value of the car "primarily due to the taxpayer's health condition, and to assist the taxpayer to reach a resolution for the taxes owed."

On January 15, 2010, respondent's Appeals Office sent petitioner a Supplemental Notice of Collection Concerning Collection Action(s) Under Section 6320 and/or 6330 with attachment, sustaining the proposed levy because a collection alternative could not be reached. In the section captioned "SUMMARY AND RECOMMENDATION", the supplemental determination states:

> the settlement officer has arrived at the conclusion that the taxpayer has determined that the only acceptable resolution to the personal and business taxes owed by him is for the Government to accept an Offer in Compromise for an amount which is far less than his ability to pay. The taxpayer has concluded that the Internal Revenue Service should forgo collection of the delinquent taxes, to enable him to save sufficient funds for his surgery. In spite of repeated requests he has failed to provide any current information regarding his health.

The supplemental determination explains the rejection of any collection alternative as follows:

> Collection Alternatives Offered by Taxpayer
>
> All the collection alternatives submitted by the taxpayer were considered. All collection alternatives proposed by the taxpayer were discussed with him. It was explained to him that he was not eligible for the collection alternative of Currently Not Collectible. He requested an Installment Agreement but declined to enter into an agreement for the amount of $200.00 per month proposed by the settlement officer. He did not want to increase the amount of his offer to the amount to $13,152.00, which the settlement officer determined to be his Reasonable Collection Potential.

In concluding that the proposed levy balanced the need for efficient collection with petitioner's concern that the collection action be no more intrusive than necessary, the supplemental notice of determination stated: "Mr. Leago's offer to compromise his liability for the sum of $2,400.00 did not adequately reflect his RCP."

The supplemental notice of determination indicates that the calculation of petitioner's reasonable collection potential (RCP) included a $60 allowance for out-of-pocket health care expenses and a $200 allowance for health insurance "based on the special medical circumstances claimed by the tax payer." With regard to these items, the supplemental notice of determination states:

> The standard amount was allowed. The taxpayer failed [to] provide any information of medicines (prescription or over the counter) he was taking on a regular or irregular basis. His bank statements and his credit card statements did not indicate that payments were being made for prescription medicine or over the counter medicine.
>
> Mr. Leago claims medical expenses for $3,100. He states this would allow him to save for future surgery he may require. As this amount far exceeds his income, the Settlement Officer was unable to understand how Mr. Leago could save an amount he did not have.

The supplemental notice of determination does not expressly indicate that the adverse determination was based on any noncompliance by petitioner with his

Federal tax obligations but contains some seemingly contradictory statements in this regard.[6]

On October 25, 2010, a trial was held in Houston, Texas. Petitioner testified that his financial circumstances had further deteriorated since the settlement officer's supplemental determination; he indicated a willingness to submit updated information. On November 10, 2010, respondent filed a status report requesting that, because of petitioner's alleged change in circumstances, the Court continue this case to allow time for him to submit a request for a collection alternative and updated supporting documentation, so that respondent's counsel might forward it to the appropriate collections office for a determination. By order dated November 22, 2010, the Court gave petitioner until December 22, 2010, to submit to respondent's counsel a new request for a collection alternative and updated financial information with supporting documentation. According to the parties' status reports, petitioner did not submit his new offer-in-compromise until July 2011. Petitioner asserted that the delay was attributable to his being homeless,

---

[6]In the section captioned "BRIEF BACKGROUND", the supplemental notice of determination states, consistent with the facts found above: "For 2009, Mr. Leago has made estimated tax payments of $1,205." Inconsistently, the body of the supplemental notice of determination states: "Review of the computer records indicated that the taxpayer was not in compliance and had not made any estimated tax payments for 2009."

with no way to receive mail and no resources. Petitioner's new offer-in-compromise was transferred to respondent's centralized offer-in-compromise unit for consideration.

In a status report filed December 7, 2011, respondent indicated that petitioner had failed to furnish requested information needed to make a decision about his new offer-in-compromise. In a status report filed January 13, 2012, petitioner indicated that he was still homeless, sharing a room with 150 people at the Salvation Army, that all his assets had been confiscated, and that respondent's transferring his case to personnel in Nashville, Tennessee, who lacked familiarity with his case had impeded its resolution.

OPINION

After a previous remand to respondent's Appeals Office, a trial, and posttrial attempts to resolve this case administratively, it remains unresolved. Although petitioner apparently has a new offer-in-compromise pending before respondent's Collection Division, it appears to have stalled. Accordingly, the focus of our review is the position that respondent's Appeals Office took in its supplemental notice of determination rejecting petitioner's earlier offer-in-compromise. See Kelby v. Commissioner, 130 T.C. 79, 86 (2008) (stating that when this Court remands a case to the IRS Appeals Office, "the further hearing is a supplement to the taxpayer's

original section 6330 hearing, [and] not a new hearing" and that we review the position taken in the last supplemental determination rather than in any prior notices).

Because petitioner has not challenged his underlying tax liabilities in this proceeding, we review the supplemental notice of determination for abuse of discretion, asking whether it was arbitrary, capricious, or without sound basis in fact or law. See, e.g., Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Sego v. Commissioner, 114 T.C. 604, 610 (2000).

Section 7122(a) and (d)(1) authorizes the Secretary to compromise a taxpayer's outstanding tax liability and requires him to prescribe guidelines for IRS officers and employees to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute. Petitioner seeks an offer-in-compromise based on doubt as to collectibility. Such an offer may be accepted "where the taxpayer's assets and income are less than the full amount of the liability." Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. Section 301.7122-1(c)(2)(i), Proced. & Admin. Regs., provides:

> A determination of doubt as to collectibility will include a determination of ability to pay. In determining ability to pay, the Secretary will permit taxpayers to retain sufficient funds to pay basic living expenses. The determination of the amount of such basic living expenses will be founded upon an evaluation of the individual

facts and circumstances presented by the taxpayer's case. To guide this determination, guidelines published by the Secretary on national and local living expense standards will be taken into account.

As a general rule, an acceptable offer-in-compromise based on doubt as to collectibility must be for an amount that equals or exceeds the taxpayer's RCP; i.e., the amount the IRS could collect through other means such as administrative and judicial collection remedies. Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517; see Internal Revenue Manual (IRM) pt. 5.8.1.1.3 (Sept. 23, 2008). In determining a taxpayer's RCP, the IRS is to take into account the taxpayer's reasonable basic living expenses. Rev. Proc. 2003-71, sec. 4.02(2). Basic living expenses are those that provide for the taxpayer's (and the taxpayer's family's) health, welfare, and production of income. IRM pt. 5.8.11.2.1(4) (Sept. 23, 2008). National and local standard expense amounts provide guidelines in determining allowable amounts of basic living expenses, but a deviation is appropriate if the standard amount is inadequate to provide for a specific taxpayer's basic living expenses. Id.

In some cases, the IRS may accept an offer of less than the RCP if there are "special circumstances". Rev. Proc. 2003-71, sec. 4.02(2). For this purpose, special circumstances are: (1) circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount

equal to the RCP; and (2) compelling public policy or equity considerations that provide sufficient basis for compromise.  See Murphy v. Commissioner, 125 T.C. at 309; McClanahan v. Commissioner, T.C. Memo. 2008-161; IRM pt. 5.8.4.3(4) (Sept. 23, 2008) (stating that the factors establishing special circumstances for doubt as to collectibility are the same as those considered under effective tax administration (ETA)); IRM pt. 5.8.11.2(2)(B) (Sept. 23, 2008).[7]  For this purpose, factors to be considered include extraordinary circumstances such as medical catastrophe and history of unemployment.  IRM pt. 5.8.11.2.1(5) (Sept. 23, 2008). Factors indicating economic hardship include, but are not limited to, the taxpayer's long-term illness, medical condition, or disability that render a taxpayer incapable of earning a living, where it is "reasonably foreseeable that taxpayer's financial resources will be exhausted providing for care and support during the course of the condition".  Sec. 301.7122-1(c)(3)(A), Proced. & Admin. Regs.; IRM pt. 5.8.11.2.1(6)(1) (Sept. 23, 2008).

---

[7]An offer-in-compromise based on ETA may be acceptable even though the taxpayer's RCP is greater than the liability owed if collection of the full liability would cause the taxpayer economic hardship or if public policy or equity considerations provide a sufficient basis for compromising the liability.  Rev. Proc. 2003-71, sec. 4.02(3), 2003-2 C.B. 517, 517.  According to the IRM as in effect when petitioner submitted his offer-in-compromise, an ETA offer-in-compromise can be considered only when the IRS has determined that the taxpayer does not qualify for consideration under doubt as to collectibility or doubt as to liability. IRM pt. 5.8.11.1(5) (Sept. 23, 2008).

The IRM as in effect when petitioner submitted his offer-in-compromise also directs that consideration should be given to "the taxpayer's overall general situation including such facts as age, health, marital status, number and age of dependents, level of education or occupational training, and work experience." IRM pt. 5.8.5.6(2) (Sept. 23, 2008). More specifically, the IRM states: "Some situations may warrant placing a different value on future income than current or past income indicates". Id. pt. 5.8.5.6(5). By way of illustration, the IRM states that if "A taxpayer is elderly, in poor health, or both and the ability to continue working is questionable", then the offer-in-compromise examiner should "Adjust the amount or number of payments to the expected earnings during the appropriate number of months. Consider special circumstance situations when making any adjustments." Id.

The settlement officer rejected petitioner's offer-in-compromise on the ground that it did not adequately reflect his ability to pay. A key issue dividing petitioner and the settlement officer was what allowance, if any, should be made for his brain surgery. It appears that the settlement officer's rejection of petitioner's offer-in-compromise was based largely on her finding that he had incurred no significant out-of-pocket costs for his alleged health condition and her conclusion that "expenses he [petitioner] was not paying for currently could not be

allowed". The settlement officer reiterated this idea in her September 23, 2009, letter to petitioner, which states: "I cannot allow expenses that you are not currently paying." And in her November 19, 2009, letter, once again rejecting petitioner's request for a monthly allowance to save up for his future brain surgery, the settlement officer stated that she "was unable to understand how Mr. Leago could save an amount he did not have." This idea reappears in the supplemental notice of determination, which gives as the reason for disallowing any allowance for future surgery expenses: "the Settlement Officer was unable to understand how Mr. Leago could save an amount he did not have." Essentially, the settlement officer seemed to believe that because petitioner could not afford surgery and had not yet incurred any out-of-pocket costs for it, no allowance could be made for it.

The settlement officer's approach is difficult to square with the applicable administrative guidelines just discussed. Under those guidelines the settlement officer should have determined whether there were "special circumstances", as petitioner claimed, that warranted the IRS' accepting an offer-in-compromise for an amount less than his RCP. It is not apparent from the administrative record that the settlement officer did so. Her determination appears to be based entirely on her assessment of petitioner's ability to pay. The supplemental notice of

determination cites parts of the IRM defining offer-in-compromise and requiring that an offer-in-compromise generally reflect the taxpayer's RCP but does not mention administrative guidelines that permit an offer-in-compromise for less than RCP if there are special circumstances such as long-term medical conditions and resulting economic hardship.

Granted, petitioner shares blame for failing to provide updated medical information, as the settlement officer requested, to better substantiate his cost estimate for his brain surgery.[8] Petitioner's view, as we understand it, was that there was no point in his incurring additional, uninsured medical expenses to confirm his need for brain surgery that he presently could not afford.

The settlement officer did not abuse her discretion in requesting that petitioner provide updated medical information. But even without this updated information, it appears that the settlement officer did not dispute several key factors that petitioner relied upon as special circumstances warranting relief--namely, that he has been diagnosed with a brain tumor, that his doctors have urged that the tumor should be surgically removed, that he has no significant assets and

---

[8]From the doctors' letters that petitioner originally provided the settlement officer, however, it would seem self-evident that the recommended surgery--involving two neurosurgeons and a hospital stay of four to five days, with 24 to 48 hours in neuro intensive care--would cost much more than the $60 per month that the settlement officer allowed as an out-of-pocket medical expense.

no health insurance and has been denied charity care, and that he continues to have health problems that have limited his ability to earn. In fact, the settlement officer's log indicates that in calculating petitioner's ability to pay, she took his health condition into account (at least to a very limited extent) by, for instance, allowing him a $200 monthly allowance for health insurance (even though he had none) "due to his medical condition" and by excluding the equity value of his only asset, his car, "primarily due [to] the taxpayer's health condition".

Ultimately, the reasons given in the supplemental notice of determination for rejecting petitioner's proposed offer-in-compromise are inadequate for us to determine whether the settlement officer abused her discretion in evaluating, or failing to evaluate, in the light of all relevant considerations, whether he had established special circumstances that might have warranted acceptance of an offer-in-compromise for an amount less than his RCP. With some reluctance we shall once again remand this case to respondent's Appeals Office for further consideration and clarification. Cf. Hoyle v. Commissioner, 131 T.C. 197, 204-205 (2008) (remanding collection case to clarify the basis for the Appeals officer's determination); Fairlamb v. Commissioner, T.C. Memo. 2010-22 (remanding collection case for clarification of the reasons for rejecting an offer-in-compromise, where the stated reasons were found to be inadequate); Oman v.

Commissioner, T.C. Memo. 2006-231 (same).  Upon remand the Appeals Office shall consider any new collection alternative that petitioner may wish to propose, including any new offer-in-compromise that he has submitted to respondent's Collection Division, and shall also consider his alleged changed circumstances.  See Churchill v. Commissioner, T.C. Memo. 2011-182 (remanding a collection case to respondent's Appeals Office for consideration of the taxpayer's changed circumstances).  Petitioner is strongly urged to provide the Appeals Office updated financial and medical information as may be requested; failure to do so may weigh heavily against favorable consideration of a collection alternative.

To reflect the foregoing,

An appropriate order
will be issued.