# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 6, 2012　　　　Decided April 20, 2012

No. 11-1191

LARRY E. TUCKER,
APPELLANT

v.

COMMISSIONER OF INTERNAL REVENUE,
APPELLEE

———

Appeal from the United States Tax Court

———

*Carlton M. Smith* argued the cause and filed the briefs for appellant.

*Teresa E. McLaughlin*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Tamara W. Ashford*, Deputy Assistant Attorney General, and *Teresa T. Milton*, Attorney.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Taxpayer Larry Tucker appeals a judgment of the Tax Court rejecting two

contentions: first, a constitutional claim that certain employees of the Internal Revenue Service's Office of Appeals are "Officers of the United States," so that their appointments must conform to the Constitution's Appointments Clause, art. II, § 2, cl. 2, and second, an argument that the employees in question abused their discretion in rejecting his proposed compromise of the collection of his tax liability. *Tucker v. Commissioner*, 135 T.C. 114 (2010) (rejecting constitutional claim); *Tucker v. Commissioner*, T.C. Memo. 2011-67, 2011 WL 1033849 (T.C. Mar. 22, 2011) (rejecting abuse of discretion claim and issuing judgment for the Commissioner). Because the authority exercised by the Appeals Office employees whose status is challenged here appears insufficient to rank them even as "inferior Officers," we reject the constitutional claim. And we find no abuse of discretion in those employees' decision in this case.

\* \* \*

Tucker underpaid his federal income taxes by a total of over $24,000 over the period 1999-2003. With interest and penalties, his liability grew to over $35,000 by 2004, when the IRS sent him a "Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320" for years 2000, 2001, and 2002. Joint Appendix ("J.A.") 7. The hearing in question, called a collection due process or "CDP" hearing, is provided for in the IRS Restructuring and Reform Act of 1998. Pub. L. No. 105-206, § 3401, 112 Stat. 685, 746 (codified at 26 U.S.C. §§ 6320 (lien actions), 6330 (levy actions)). Such a hearing is an opportunity for a taxpayer to challenge the propriety of a pending tax lien or levy, to verify that a collection action against him is appropriate under the law, and to offer alternatives, one of which is a so-called offer-in-compromise or "OIC" (Tucker's preferred outcome). *Id*. §§ 6320(c), 6330(c)(2)(A). Challenges to underlying tax

liability can also be raised at a CDP hearing, but only if the taxpayer did not receive statutory notice of the liability or did not otherwise have an opportunity to dispute it. *Id.* §§ 6320(c), 6330(c)(2)(B).

The 1998 statute calls for CDP hearings to take place in the Office of Appeals. *Id.* §§ 6320(b)(1), 6330(b)(1). Although no statute *created* that office, its existence is now reflected in various provisions of the Internal Revenue Code, such as the ones governing CDP hearings. See *Tucker*, 135 T.C. at 135-36 & n.49 (noting additional references). Besides providing for decision by an "officer or employee" of Appeals, the statute, in the interest of assuring a measure of independence between Appeals and other arms of the IRS, see § 1001(a)(4) of the 1998 Act, 112 Stat. at 689, specifies that the decisionmaker will be one with no prior involvement with the unpaid tax at issue, and directs the IRS to adopt rules against *ex parte* communications. 26 U.S.C. §§ 6320(b)(3), 6330(b)(3); Rev. Proc. 2000-43, 2000-2 C.B. 404 (to be superseded by Rev. Proc. 2012-18, effective May 15, 2012). Despite the word "hearing" and these seemingly trial-like features, the officer or employee does not adjudicate between adversaries, but rather represents the IRS—we discuss the procedures more below. A disappointed taxpayer can challenge the CDP hearing outcome in the Tax Court. See 26 U.S.C. §§ 6320(c), 6330(d)(1).

In Tucker's case the IRS was represented by a "settlement officer" (one of two types of IRS workers who conduct CDP hearings, the other type being "appeals officers"). After the hearing, Tucker proposed an OIC instead of the partial installment plan offered by the settlement officer, but the latter rejected his proposal, and her decision was approved by her "team manager"—a position tasked with overseeing various Appeals functions, including CDP hearings.

Tucker appealed to the Tax Court. That court initially remanded the matter back to Appeals for a supplemental CDP hearing, in which a different settlement officer and team manager again rejected Tucker's OIC. The case then resumed in the Tax Court, which rejected Tucker's constitutional and abuse of discretion arguments.

\* \* \*

The Appointments Clause provides that

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art II, § 2, cl. 2. The clause plainly distinguishes between "principal" and "inferior" officers, and its requirements have no application to employees falling below the "officer" threshold. See *Freytag v. Commissioner*, 501 U.S. 868, 880-81 (1991) (citing *Buckley v. Valeo*, 424 U.S. 1, 126 & n.162 (1976)). Although Tucker appeared to argue in his briefs that the clause governed all Office of Appeals workers involved in CDP hearings, at oral argument his counsel limited the challenge to team managers, who oversee the CDP determinations. Oral Arg. at 11:50-12:55. As our analysis applies equally to team managers, settlement officers, and appeals officers, however, we will use the term "Appeals employees" to refer to all in the three groups. We review the Tax Court's decision on this issue de novo.

The Supreme Court has often said that to be an "Officer of the United States" covered by Article II, a person must "exercis[e] significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 125-26; see also *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3160 (2010); *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000). In assessing Tucker's claim, we look not only to the authority that Appeals employees wielded in Tucker's case but to *all* their duties, or at least those to which Tucker calls attention. *Freytag*, 501 U.S. at 882 (rejecting government's argument that an Appointments Clause challenger may rely only on authorities exercised over him). Most importantly, these duties include review of taxpayers' underlying tax liability, even though Tucker's liability was never at issue before the Office of Appeals. Because Appeals employees in CDP hearings exercise the most "significant" authority in disposing of liability questions (which of course they commonly address outside the CDP context), we will address the authority involved in liability review first, and will then return to the collection-related aspects of CDP review.

Before discussing how the authority of Appeals employees compares with that of persons found to be "Officers," we first consider—and ultimately bypass—whether, in the words of the clause, their positions were "established by Law." *Landry*, 204 F.3d at 1133. As we have explained, no statute created positions in the Office of Appeals, but the 1998 act entitled taxpayers to a hearing in that office, 26 U.S.C. §§ 6320(b)(1), 6330(b)(1), and called for a determination by the "appeals officer" on various issues relating to a proposed collection and to tax liability, *id.* §§ 6320(c), 6330(c); see also 26 C.F.R. §§ 601.103(c) (providing taxpayers the general opportunity to contest tax liability before Office of Appeals, outside of CDP context); see generally *id.* § 601.106 (describing Office of Appeals functions and procedures). Similarly as to regulations: 26

C.F.R. § 601.106 may "establish" the Office of Appeals, and the relevant Internal Revenue Manual provisions do delegate various responsibilities to settlement officers, appeals officers, and team managers, see, e.g., I.R.M. exh. 8.22.2-4, Delegation Order Appeals-193-1 (Mar. 16, 2010) (formerly App 8-1 (Rev. 1)), but the parties have not pointed us to a regulation or other agency authority in which these positions themselves are "established" in any formal sense. Rather, they appear simply to be types of employees used by the Commissioner pursuant to his general hiring power. 26 U.S.C. § 7804(a); see *Tucker*, 135 T.C. at 116, 119.

Nonetheless, it would seem anomalous if the Appointments Clause were inapplicable to positions extant in the bureaucratic hierarchy, and to which Congress assigned "significant authority," merely because neither Congress nor the executive branch had formally created the positions. See Appellant's Br. 35-36; *Tucker*, 135 T.C. at 158. See also DOJ Office of Legal Counsel, Officers of the United States for Purposes of the Appointments Clause, 2007 OLC LEXIS 3, at *118 (Apr. 16, 2007) ("[T]he rule for which sorts of positions have been 'established by Law' such that they amount to offices subject to the Appointments Clause cannot be whether a position was formally and directly created as an 'office' by law. Such a view would conflict with the substantive requirements of the Appointments Clause.").

In any event, because we conclude below that Appeals employees do not exercise significant authority within the meaning of the Appointments Clause cases, we need not resolve whether their positions were "established by Law" for

purposes of that clause.[1]  We therefore turn to the authority they exercise.

Although the cases are not altogether clear, the main criteria for drawing the line between inferior Officers and employees not covered by the clause are (1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions.  In light of *Freytag* we can assume here that the issue of a person's tax liability is substantively significant enough to meet factor (1), in which case degrees of discretion and finality will ultimately be determinative.  Thus the special trial judges ("STJs") found to be inferior Officers in *Freytag* actually rendered the final decisions of the Tax Court in some matters (specified declaratory judgment and limited-amount tax cases), 501 U.S. at 882, while in others they played a less final role, taking evidence and preparing proposed findings of fact and opinions, *id*. at 880-81.  Even when STJs acted in the latter, seemingly ancillary role, they exercised discretion on such matters as rulings on admissibility and enforcing compliance with discovery orders, *id*. at 881-82, and their factual findings were entitled to deference, being reversible by the Tax Court only if clearly erroneous, *Landry*, 204 F.3d at 1133 (citing what was then Tax Court Rule 183(c), now 183(d), and *Stone v. Commissioner*, 865 F.2d 342, 344-47 (D.C. Cir. 1989)).  In *Landry*, by contrast, we found the absence of any authority to render final decisions fatal to the claim that the administrative law judges at issue there were Officers rather than employees.  204 F.3d at 1133-34.

---

[1] We read *Landry*'s reference to the "established by Law" question as a "threshold trigger," 204 F.3d at 1133, to mean that such an inquiry may but need not be the start of an Appointments Clause analysis.

The degree of discretion enjoyed by the officeholder is clearly an element in the mix. Thus in *Freytag* the Court was at pains to note that the STJs' tasks were "more than ministerial." 501 U.S. at 881. If the tasks assigned a position allowed the holder no choice, obviously, it would be pointless to classify him as an "Officer" even though the consequences of his ministerial decisions were both vital and final. And in this case, in fact, we conclude that the lack of discretion is determinative, offsetting the effective finality of Appeals employees' decisions within the executive branch.

Appeals employees' discretion is highly constrained. Before turning to the constraints, we note the characteristic of Appeals's powers that seems most significant. The office is authorized to compromise disputed tax liability on the basis of its probabilistic estimates of the hazards of litigation. Thus, if Appeals estimates that the IRS's chances of prevailing on a disputed point of law are 60%, it may agree to accept only 60% of the liability that turns on the point. See 26 C.F.R. § 601.106(f)(2); see generally 26 U.S.C. § 1722.

But in reaching such decisions (and indeed in all its decisions), Appeals is subject to consultation requirements, to guidelines, and to supervision. First, the office is instructed in the Internal Revenue Manual to "[r]equest legal advice from an Associate Chief Counsel office on novel or significant issues." I.R.M. pt. 8.6.3.5 (Oct. 26, 2007). Second, the Manual tells Appeals to seek a "Technical Advice Memorandum" from the Chief Counsel's Office "when a lack of uniformity exists on the disposition of the issue or the issue is unusual or complex enough to warrant consideration by the Office of Chief Counsel." *Id*. pt. 8.6.3.3(3) (July 15, 2010); see also 26 C.F.R. § 601.106(f)(9). (The Chief Counsel is appointed by the President with the advice and consent of the Senate. 26 U.S.C. § 7803(b)(1).) Third, Appeals is required to follow any established technical or legal IRS position that

is favorable to the taxpayer. I.R.M. pt. 8.6.3.5.2; 26 C.F.R. § 601.106(f)(9)(viii)(*c*). Fourth, various regulations and the Internal Revenue Manual impose detailed guidelines for what settlements Appeals may accept. See, e.g., 26 C.F.R. § 601.106(f); I.R.M. pt. 8.23.1; see also 26 U.S.C. § 7122(d)(1) (requiring the Secretary to prescribe such guidelines). Fifth, Appeals must obtain a favorable opinion from the General Counsel for the Treasury for any compromise in which the unpaid amount of tax is $50,000 or more, and its compromises of smaller amounts are subject to "continuing quality review by the Secretary." 26 U.S.C. § 7122(b). The authority to provide a favorable opinion for compromises of $50,000 or more has been delegated to the Chief Counsel and redelegated to Division Counsel, see I.R.M. pt. 33.3.2.1(3) (Nov. 4, 2010), but such delegations could be revoked at the General Counsel's discretion. Sixth, any "closing agreement" relieving a taxpayer of liability must be approved by the Secretary. 26 U.S.C. § 7121(b). As with the General Counsel approval, that authority has been delegated to the Commissioner, 26 C.F.R. § 601.202(a)(1), and redelegated to others including some Appeals employees, see Delegation Order 8-3, I.R.M. pt. 1.2.47.4 (Aug. 18, 1997) (formerly Delegation Order No. 97 (Rev. 34)); I.R.M. pt. 8.13.1.1.6 (Nov. 9, 2007), but the Secretary remains free to revoke it if he finds defects in practice under the delegations.

We noted earlier that *Freytag* had relied in part on the STJs' procedural powers, such as the authority to take testimony and to rule on admissibility of evidence. See 501 U.S. at 881-82. Appeals does nothing of this sort. It does not hold trials at all. It simply provides a chance for the taxpayer (and his counsel) to use argument and information to claim more favorable treatment than he has received from IRS employees encountered earlier in the process. "Proceedings before Appeals are informal," and "[t]estimony under oath is not taken," although taxpayers are free to submit factual

materials such as affidavits. 26 C.F.R. § 601.106(c). In cases not yet docketed in Tax Court, the district director is represented only if the district director and the Appeals employees with settlement authority "deem it advisable." *Id*. Of course we do not understand *Freytag* to suggest that mere informality of proceedings, or the absence of adversarial procedures, could justify denying "Officer" status to one whose powers would otherwise demand that classification. But the Court in *Freytag* may have taken the presence of those procedures as a signal from Congress of the weightiness of the substantive powers granted. That signal is missing here.

Accordingly, we find even Appeals employees' authority over tax liability insufficient to rank them as inferior Officers.

This being so, it is plain that the authority they exercise in the pure collections aspects of CDP hearings is not enough. As to those functions, the government is simply a creditor, and accordingly Appeals employees must make decisions based largely on the same mundane and practical concerns that any creditor faces. They include, of course, a potential need to compromise even the amount to be collected, but Appeals acts in such matters under the general duties discussed above—to seek advice from the Office of Chief Counsel or an Associate Chief Counsel, and to obtain review from the General Counsel for any decisions involving monetary compromise, and of course is subject to Secretarial monitoring. Accordingly, the significance and discretion involved in the decisions seem well below the level necessary to require an "Officer."

\* \* \*

Tucker claims that even absent a constitutional deficiency, the Office of Appeals's failure to accept his proposed OIC was an abuse of discretion. The Tax Court

rejected this claim, see *Tucker*, T.C. Memo. 2011-67, 2011 WL 1033849, at \*14, and so do we.

Tucker's primary argument is that the settlement officer in his supplemental CDP hearing wrongfully counted as "dissipated assets" some losses that he incurred in 2003 in day trading on the stock market. The concept of "dissipated assets" becomes relevant when Appeals considers a taxpayer's OIC proposal because of doubt about the collectability of a taxpayer's outstanding liability (the case here); Appeals is to accept the OIC only where it reflects the taxpayer's "reasonable collection potential" ("RCP"). Rev. Proc. 2003-71, § 4.02(2), 2003-2 C.B. 517. In calculating the RCP, Appeals inflates it by the amount of "dissipated assets"—not because they are in fact accessible to the taxpayer (they obviously are not), but to discourage such dissipation. See *Tucker*, T.C. Memo. 2011-67, 2011 WL 1033849, at \*11. The concept is defined as "assets (liquid or non-liquid) [that] have been sold, gifted, transferred, or spent on non-priority items and/or debts and are no longer available to pay the tax liability." I.R.M. pt. 5.8.5.4(1) (Sept. 1, 2005). Dissipated assets can be included in computing RCP if they have been dissipated "with a disregard" for outstanding tax liability. *Id*. pt. 5.8.5.4(5).[2]

Tucker does not dispute that at the time he placed the $44,000 in his day trading account (January through April 3, 2003), leading to $22,645 in stock losses (accumulated by April 21, 2003, the date he stopped trading), his accrued tax liability (for years 1999, 2000 and 2001) was $14,945. See *Tucker*, T.C. Memo. 2011-67, 2011 WL 1033849, at \*11-12

---

[2] The current version of the Manual addresses the inclusion of dissipated assets in reasonable collection potential at I.R.M. pt. 5.8.5.16(7) (Oct. 22, 2010).

& n.12.  He also does not dispute that settlement officers can include assets dissipated "with a disregard" for tax liability in a taxpayer's RCP.  But he argues that the settlement officer miscalculated the amount of his day trading losses when she concluded that those losses exceeded his tax liability at the time, and that therefore the Tax Court, after it corrected the calculation, was barred by the principle of *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), from upholding Appeals's determination.  He also argues that his day trading losses should not count against him at all because they were investments made in a good faith attempt to earn more money to pay off all of his debts.  Neither argument has merit.

Regarding whether the amount of the dissipated assets exceeded Tucker's tax liability, the settlement officer in Tucker's supplemental CDP hearing concluded that "at the least, the money deposited [in Tucker's E-Trade account, i.e. the $44,700] could be included in the reasonable collection potential of an offer as dissipated cash assets.  The amounts deposited were sufficient to full [sic] pay the taxes."  Attachment to Supplemental Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (Sept. 12, 2006), J.A. 38.  The Tax Court found that the settlement officer erred in treating the whole $44,700 as dissipated, because Tucker ultimately withdrew $22,000 from the account and maintained that he spent that amount on basic living expenses, making it excludable from RCP under I.R.M. pt. 5.8.5.4(4).  See *Tucker*, T.C. Memo. 2011-67, 2011 WL 1033849, at *12-13.

Nonetheless, the Tax Court found no abuse of discretion.  Given that Tucker's $22,645 losses up to the date he stopped trading (April 21, 2003) exceeded his then accrued tax liability of $14,945, it found that the lost $22,000 was enough

to pay his then due tax.[3]  Accordingly, the court found the settlement officer's erroneous reliance on the full deposit amount harmless.  See *id*. at \*12-13 & n.16.

On appeal Tucker argues that the Tax Court improperly "rework[ed]" the settlement officer's analysis in violation of the *Chenery* principle, which requires a court reviewing an agency action to "judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."  332 U.S. at 196.

But the Tax Court *did* judge the propriety of the settlement officer's consideration of dissipated assets solely on the grounds invoked:  that the amount of such assets "[was] sufficient to full [sic] pay the taxes."  Attachment to Supplemental Notice of Determination, J.A. 38; see also *id*., J.A. 39 ("Appeals has determined that you could have full [sic] paid the balances already.").  That the settlement officer incorrectly used the higher amount, Tucker's initial placing of funds, rather than just the amount of losses, does not change its reasoning or conclusion that the amount dissipated exceeded his outstanding tax liability at the time.  We therefore find no *Chenery* problem.  See also *PDK Laboratories Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

---

[3] The Tax Court slightly fudged the issue of the exact date by which his losses tipped over the $14,945 level, but it seems safe to say that they must have done so before his 2002 taxes fell due on April 15, 2003.  In any event, Tucker makes no issue of this potential discrepancy.

Tucker's second argument is that Appeals erred in including his day trading losses as dissipated assets because doing so in effect "requires all taxpayers to liquidate all assets upon initial assessment of taxes to avoid potentially 'dissipating' an asset via decline in asset value prior to payment. Under such a rule, a taxpayer would be required to sell her house immediately upon assessment of a tax liability for fear of a drop in its value." Appellant's Br. 54-55. But as the Commissioner points out, a mere drop in value of an existing asset would not count as dissipated because it would not have been "transferred" or "spent." We also find no abuse of discretion in Appeals's apparently finding Tucker's day trading to be more speculative than, e.g., buying or refinancing a home, and therefore finding the former and not the latter to qualify as "disregard" for one's tax liability.

Finally, because we find no abuse of discretion in the settlement officer's reliance on dissipated assets, we need not consider Tucker's attack on the Commissioner's alternative defense of Appeals's rejection of the OIC, namely that Appeals may reject an OIC simply because it will be able to collect more through a partial installment plan (under which the IRS can periodically update the required installment payments to reflect a taxpayer's increase in income). We note, however that the OIC guidelines appear to allow rejection of an OIC "if it is believed that the liability can be paid in full." I.R.M. pt. 8.23.1.1(6) (Sept. 13, 2011). This is essentially the position the settlement officer took here in rejecting the OIC and preserving the IRS's advantages under the partial installment plan.

* * *

We conclude that Office of Appeals team managers, settlement officers, and appeals officers are not inferior Officers who must be appointed in conformity with the

Appointments Clause, and that there was no abuse of discretion in the Office's rejection of Tucker's proposed offer-in-compromise.  The judgment of the Tax Court is therefore

*Affirmed*.