T.C. Memo. 2012-274

UNITED STATES TAX COURT

A. DEEWAYNE JONES AND SHIRLEY JONES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 312-10L.                    Filed September 26, 2012.

A. DeeWayne Jones and Shirley Jones, pro sese.

<u>Nathan C. Johnston</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Pursuant to sections 6320 and 6330(d),[1] petitioners seek

review of respondent's determination to sustain the filing of a notice of Federal tax

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue
Code for the relevant period, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

[*2] lien (NFTL) with respect to their unpaid Federal income tax liabilities for 2002-05. The issue for decision is whether respondent's determination was an abuse of discretion.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and facts drawn from stipulated exhibits are incorporated herein by this reference. Petitioners resided in California when they filed their petition.

At the time of respondent's determination A. DeeWayne Jones (Dr. Jones) was a 74-year-old semiretired dentist, and his wife, Shirley Jones, was a 74-year-old retired secretary.

Petitioners' tax troubles began in 2007 when respondent examined petitioners' 2002-05 tax returns. As a result of the examinations petitioners agreed to adjustments to the income tax liabilities shown on their 2002-05 tax returns, and respondent assessed the resulting deficiencies. As of September 28, 2009, petitioners had balances outstanding of $16,259, $17,171, $8,059, and $9,976 for the 2002, 2003, 2004, and 2005 tax years, respectively, totaling $51,465.

On January 27, 2009, respondent mailed to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 for the 2002-05 tax years. Petitioners timely submitted a Form 12153, Request for a Collection Due

[*3] Process or Equivalent Hearing (section 6320 hearing request), seeking

withdrawal of the NFTL and acceptance of an offer-in-compromise (OIC) as a

collection alternative.  Respondent received petitioners' section 6320 hearing

request on February 7, 2009.[2]  On February 23, 2009, respondent levied on

petitioners' Bank of America checking accounts, collecting $923.62.[3]  Respondent

later posted this amount as a payment to petitioners' 2002 tax year account.

On or around February 25, 2009, petitioners submitted a Form 656, Offer in

Compromise, dated February 24, 2009.  At the same time, petitioners submitted a

Form 433-A, Collection Information Statement for Wage Earners and Self-

Employed Individuals (first Form 433-A), in support of their OIC.  Petitioners'

---

[2]The parties stipulated that respondent received petitioners' section 6320 hearing request on February 25, 2009.  However, this stipulation is contradicted by a stipulated exhibit titled "Collection Due Process Case History Record", which states that respondent received petitioners' section 6320 hearing request on February 7, 2009.  We disregard the stipulation as inconsistent with the stipulated exhibit in the record.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

[3]At some point before levying on petitioners' bank accounts, respondent apparently issued a notice of intent to levy under sec. 6330.  Upon receiving that notice, petitioners timely requested a sec. 6330 hearing, on a Form 12153 dated February 21, 2008, proposing an installment agreement as a collection alternative for tax years 2002-05.  Sometime before December 1, 2008, petitioners' authorized representative withdrew petitioners' sec. 6330 hearing request for tax years 2002-03.  There is nothing in the record before us as to the status of petitioners' sec. 6330 hearing request for tax years 2004-05.

[*4] OIC was $5,500, with a $1,100 downpayment and the remainder due within three months. Petitioners' first Form 433-A listed only one property as real estate they owned. The address petitioners provided for that property was 722 East Main Street, Santa Paula, California (Santa Paula property).

Respondent subsequently mailed to petitioners two letters, both dated April 14, 2009. The first was from the Appeals Office in Fresno, California, acknowledging receipt of petitioners' section 6320 hearing request. The second was from Offer Specialist P. Pfeiffer, writing from an office in Glendale, California.

In his letter Offer Specialist Pfeiffer requested, among other items, (1) an updated Form 433-A and a completed Form 433-B, Collection Information Statement for Businesses, with proof of payment of all expenses listed on the Form 433-B; (2) a copy of petitioners' 2008 Federal income tax return; (3) copies of all books and records relating to petitioners' 2008 tax year; (4) a list of all real property owned by petitioners within the last five years; (5) copies of residential rental agreements, including proof of payment for three months; (6) completed personal questionnaires; (7) an explanation of how petitioners meet their monthly expenses; and (8) written explanations with respect to several items flagged by respondent. The written explanations requested included the following: (1) an

[*5] explanation of what had happened to various properties that respondent had on record as belonging to petitioners, or the inclusion of the properties on petitioners' updated Form 433-A; and (2) an explanation of petitioners' affiliation with "Canyon Crest Ranch Partners - Moorpark" (Canyon Crest).  In particular, respondent inquired about the following properties:  652 Zurich Drive, Lake Arrowhead, California (Lake Arrowhead property), and 1035 and 1055 Marine View Drive, Moorpark, California (Moorpark properties).

Through their authorized representative, Robert D. Heinrich, C.P.A., petitioners timely responded to respondent's information request.  In a letter dated April 22, 2009, and addressed to Offer Specialist Pfeiffer, Mr. Heinrich stated, among other things, (1) that Dr. Jones works for the county prison system and has no assets for his business; (2) that petitioners meet their expenses by borrowing from their children and by using credit cards; (3) that petitioners own two properties, the Santa Paula property and the Lake Arrowhead property; (4) that petitioners omitted the Lake Arrowhead property from their first Form 433-A because "the property was upside down" and in severe disrepair, with needed repairs totaling almost $75,000; (5) that the Moorpark properties are owned by Canyon Crest; and (6) that petitioners own 67% of Canyon Crest.  Mr. Heinrich also enclosed, among other documents, (1) an updated Form 433-A and a

[*6] completed Form 433-B for petitioners; (2) petitioners' 2008 joint Federal income tax return; (3) a copy of Dr. Jones' 2008 Form 1099-MISC, Miscellaneous Income; (4) copies of a check register supporting expenses petitioners reported on Dr. Jones' Schedule C, Profit or Loss From Business, for 2008; (5) a copy of a residential rental agreement for a residence at 12317 Willow Hill Drive, Moorpark, California (Moorpark residence); (6) copies of recent rent checks to the landlord of the Moorpark residence (paid by Jodi Jones Proud, petitioners' daughter); (7) completed questionnaires for petitioners; (8) copies of an insurance cancellation notice for the Lake Arrowhead property; and (9) copies of a bid to reroof the home on the Lake Arrowhead property and of an estimate of the cost to repair severe water damage and leakage to the Lake Arrowhead property.

On their updated Form 433-A, petitioners reported, under penalty of perjury, that they had monthly gross income of $6,626 and monthly living expenses of $7,079. Petitioners also reported the following assets: (1) two Bank of America checking accounts with balances of $1,250 and $300, respectively;[4] (2) a 1997 Ford Explorer with a current value of $1,000; (3) a 2002 Ford Explorer with a current value of $2,500; (4) the Santa Paula property with a current value of

---

[4]Petitioners erroneously calculated their total checking account balances to be $5,550.

[*7] $450,000 and a loan balance of $460,000; (5) the Lake Arrowhead property with a current value of $155,000 and a loan balance of $155,468; and (6) furniture and personal effects with a current value of $3,400.

On the completed questionnaires that petitioners submitted to respondent, Dr. Jones stated that his health was fair, that he was currently employed as a dentist for the Ventura County Sheriff's Department, and that he planned on retiring within five years; and Mrs. Jones stated that her health was poor and that she was retired. As requested, petitioners described the serious, chronic medical conditions that led them to describe their health as fair and poor, respectively.

In late June or early July respondent informed petitioners that their OIC would be handled by Appeals because they filed their OIC after filing their section 6320 hearing request. In a letter dated July 10, 2009, respondent notified petitioners and Mr. Heinrich that petitioners' "[OIC] had been accepted as processable and will be worked in Appeals."

In a letter dated September 29, 2009, Settlement Officer Lisanti notified petitioners and Mr. Heinrich of a scheduled conference call for October 20, 2009, with respect to petitioners' section 6320 hearing request.

Petitioners and Mr. Heinrich did not call into the October 20, 2009, conference call, and in a letter to petitioners and Mr. Heinrich dated that same day,

**[\*8]** Settlement Officer Lisanti noted petitioners' failure to call and advised petitioners that they had until November 3, 2009, to submit materials for consideration in the section 6320 hearing.

On November 5, 2009, Mr. Heinrich left a voicemail for Settlement Officer Lisanti, requesting a return phone call. Settlement Officer Lisanti then left a message on Mr. Heinrich's voicemail, requesting a call back by the close of business that day. Hearing nothing, Settlement Officer Lisanti left a message on Mr. Heinrich's voicemail on November 6, 2009, noting that several deadlines had passed and informing him that he would have to confer with her soon. Settlement Officer Lisanti further informed Mr. Heinrich that she would not be recommending the OIC because petitioners had sufficient income and assets to pay their full account. Settlement Officer Lisanti then gave Mr. Heinrich a deadline of November 14, 2009, to contact her regarding any installment agreement that petitioners might be interested in pursuing and stated that otherwise the case would be closed and a notice of determination would be issued, sustaining the filing of the NFTL. On November 10, 2009, Settlement Officer Lisanti left another voicemail for Mr. Heinrich, asking him to return her phone call by November 13, 2009, and also inquiring whether petitioners were interested in alternatives to an OIC. Also on November 10, 2009, Settlement Officer Lisanti

[*9] faxed a copy of her reasonable collection potential analysis (worksheet) to Mr.

Heinrich. This was the first time that Settlement Officer Lisanti provided to

petitioners any information regarding the details of her analysis.

Settlement Officer Lisanti's worksheet showed that petitioners had gross

monthly income of $8,941, monthly expenses of $4,917, and net monthly income of

$4,024.[5] Accordingly, the worksheet showed that the present value of

---

[5]Specifically, Settlement Officer Lisanti made the following adjustments to petitioners' claimed income and expenses:

| Gross monthly income | Taxpayers | Appeals |
| --- | --- | --- |
| Interest--dividends | -0- | $331 |
| Net business income | $4,600 | 4,600 |
| Pension/SSA (taxpayer) | 1,351 | 2,334 |
| Pension/SSA (spouse) | 675 | -0- |
| Other | -0- | 1,676 |
| Total income | 6,626 | 8,941 |

| Monthly expenses | Taxpayers | Appeals |
| --- | --- | --- |
| Allowable national standard expense--2 people | $550 | $961 |
| Local housing and utilities (Los Angeles) | 3,473 | 2,236 |
| Local transportation: | | |
| Ownership costs--vehicle 1 | 700 | -0- |
| Operating costs--vehicle 1 | -0- | 100 |
| Operating costs--vehicle 2 | -0- | 261 |
| Other allowable expenses: | | |
| Health insurance premiums | 1,058 | 656 |
| Life insurance | 798 | 200 |
| Taxes (income & FICA) | 500 | 503 |

(continued...)

**[*10]** petitioners' future income and expenses was $193,152. Additionally, the worksheet showed that petitioners had net realizable equity in assets of $193,239. In calculating petitioners' net realizable equity in assets, Settlement Officer Lisanti included $5,550 for petitioners' Bank of America checking accounts, $800 for petitioners' 1997 Ford Explorer, $2,000 for petitioners' 2002 Ford Explorer, $164,932 for the Lake Arrowhead property, and $19,957 for the total amount of petitioners' 2007 and 2008 charitable contributions as dissipated assets.[6]

On November 12, 2009, Mr. Heinrich left a voicemail for Settlement Officer Lisanti in which he stated that he disagreed with the value that Settlement Officer Lisanti attributed to the Lake Arrowhead property and with her adjustments to petitioners' allowable living expenses on the worksheet. Mr. Heinrich also

---

[5](...continued)

| | | |
|---|---|---|
| Total expenses | 7,079 | 4,917 |
| Net monthly income | (453) | 4,024 |

[6]Dr. Jones offered into evidence a document dated November 11, 2009, that Mr. Heinrich claimed he had faxed to Settlement Officer Lisanti, detailing his disagreements with the adjustments on Settlement Officer Lisanti's worksheet. We did not admit the document into evidence because Dr. Jones lacked personal knowledge that the document had been faxed to Settlement Officer Lisanti, see Fed. R. Evid. 802; Rule 143, and Mr. Heinrich was unavailable to authenticate the document as having been faxed to Settlement Officer Lisanti.

**[\*11]** indicated that he would supply further documentation by a date that is unclear from the record, but possibly as late as November 20, 2009.[7]

On November 19, 2009, Settlement Officer Lisanti left a voicemail for Mr. Heinrich, informing him that she would be closing the case and reminding him that petitioners had the right to seek judicial review of the determination. On December 3, 2009, Settlement Officer Lisanti terminated the section 6320 hearing.

On December 9, 2009, respondent mailed to petitioners the notice of determination, sustaining the filing of the NFTL. The Appeals Office attached a statement prepared by Settlement Officer Lisanti and a copy of her worksheet. In the statement Settlement Officer Lisanti stated that Dr. Jones is "in apparent good health" and that Mrs. Jones has "no known health problems." In explaining why the Appeals Office rejected petitioners' OIC, Settlement Officer Lisanti explained that a taxpayer's reasonable collection potential is calculated by adding the taxpayer's net realizable equity in assets to the present value of the taxpayer's future income and expenses. Settlement Officer Lisanti then stated that

---

[7]The parties stipulated, and a document in evidence titled "Case Activity Record Print" shows, that Mr. Heinrich promised to provide the supporting documentation to Settlement Officer Lisanti by the end of the next day, November 13, 2009. However, in a statement attached to the Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330 (notice of determination), Settlement Officer Lisanti stated that Mr. Heinrich agreed to provide the supporting documentation via fax by November 20, 2009.

[*12] petitioners' net realizable equity in assets was $193,239 and that "[n]o further analysis is required to determine that an OIC based on * * * [doubt as to collectibility] is not an acceptable resolution to the taxpayers' account." Settlement Officer Lisanti stated that she determined the value of petitioners' Lake Arrowhead property by using Zillow.com.[8] Settlement Officer Lisanti also noted that petitioners' net realizable equity in assets, as determined by petitioners' own financial statements, was $9,050, nearly twice the amount petitioners offered. According to Settlement Officer Lisanti, this indicated that the offer was "unacceptable on its face".

As an additional consideration, Settlement Officer Lisanti noted that petitioners had reported $3,968 of interest income on their 2008 Federal income tax return from accounts that petitioners did not include on the financial statements they provided.[9] According to Settlement Officer Lisanti, this indicated that "there may be additional * * * assets that should be part of the * * * [reasonable collection potential] calculation that are not included on my

---

[8]The "Zestimate" for the Lake Arrowhead property was $355,500, and the "Value Range" was $245,295-$369,720.

[9]On their 2008 Schedule B, Interest and Ordinary Dividends, petitioners reported interest income from three accounts: $49 from a Community West Bank account; $670 from a Washington Mutual account; and $3,249 from a JP Morgan Chase Bank account.

[*13] worksheet." In fact, respondent conceded at trial that Settlement Officer Lisanti was aware that these accounts contained insurance proceeds from a fire that destroyed petitioners' home on the Moorpark properties in 2006. Finally, Settlement Officer Lisanti stated that there were no special circumstances that would warrant consideration on any other basis.

Upon receiving the notice of determination, petitioners timely filed their petition with this Court, contesting respondent's determination to sustain the filing of the NFTL.

OPINION

I.      Section 6320 Hearings

Section 6321 imposes a lien on all property and property rights of a taxpayer liable for taxes where a demand for the payment of the taxes has been made and the taxpayer fails to pay. The Internal Revenue Service (IRS) is authorized to file an NFTL with respect to taxpayers that have outstanding tax liabilities and fail to pay after notice and demand. Sec. 6323. Section 6320(a) requires the Secretary[10] to send written notice to the taxpayer of the filing of an NFTL and of the taxpayer's right to an administrative hearing on the matter. The

---

[10]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[*14]** conduct and scope of section 6320 hearings are governed by section 6330(c), (d) (other than paragraph (2)(B)), and (e).  Sec. 6320(c).  At the hearing, a taxpayer may raise any relevant issue, including appropriate spousal defenses, challenges to the appropriateness of the collection action, and collection alternatives, such as an OIC or an installment agreement.  Sec. 6330(c)(2)(A).

Following the hearing, the Appeals Office must issue a notice of determination regarding the validity of the filed NFTL.  The Appeals Office is required to take into consideration:  (1) verification presented by the Secretary that the requirements of applicable law and administrative procedure have been met, (2) relevant issues raised by the taxpayer, and (3) whether the proposed collection action appropriately balances the need for efficient collection of taxes with a taxpayer's concerns regarding the intrusiveness of the proposed collection action.  Sec. 6330(c)(3); Wadleigh v. Commissioner, 134 T.C. 280, 287-288 (2010).

We have jurisdiction to review the Appeals Office's determination.  Sec. 6330(d)(1); see Murphy v. Commissioner, 125 T.C. 301, 308 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).  Where the underlying tax liability is properly at issue, we review any determination regarding the underlying tax liability de novo.  Sego v. Commissioner, 114 T.C. 604, 610 (2000).  Where, as here, the underlying tax liability is not properly at issue, we review the administrative determination of the

**[\*15]** Appeals Office for abuse of discretion. Lunsford v. Commissioner, 117 T.C. 183, 185 (2001); Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. 176, 182 (2000). In reviewing for abuse of discretion, we do not conduct an independent review of whether an OIC submitted by a taxpayer was acceptable or substitute our judgment for that of the Appeals Office. Rather, we must uphold the Appeals Office's determination unless it is arbitrary, capricious, or without sound basis in fact or law. See, e.g., Murphy v. Commissioner, 125 T.C. at 320; Taylor v. Commissioner, T.C. Memo. 2009-27, 97 T.C.M. (CCH) 1109, 1116 (2009); see also Fargo v. Commissioner, 447 F.3d 706, 709 (9th Cir. 2006) ("Abuse of discretion occurs when a decision is based 'on an erroneous view of the law or a clearly erroneous assessment of the facts.'" (quoting United States v. Morales, 108 F.3d 1031, 1035 (9th Cir. 1997))), aff'g T.C. Memo. 2004-13. However, we can uphold the Appeals Office's determination only on grounds actually relied upon by the Appeals officer in the notice of determination. See Salahuddin v. Commissioner, T.C. Memo. 2012-141, slip op. at 16 (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943)); Rosenbloom v. Commissioner, T.C. Memo. 2011-140, 101 T.C.M. (CCH) 1669, 1674 n.17 (2011); see also Safe Air For Everyone v. EPA, 488 F.3d 1088, 1091 (9th Cir. 2007); Carpenter Family

**[\*16]** <u>Invs., LLC v. Commissioner</u>, 136 T.C. 373, 380 (2011) (citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)).

II.    <u>Parties' Arguments</u>

A.    <u>Petitioners' Arguments</u>

Petitioners contend that respondent abused his discretion in determining to sustain the filing of the NFTL for several reasons:

First, petitioners contend that it was their impression that Settlement Officer Lisanti only denied their OIC because she determined that they had sufficient equity in the Lake Arrowhead property to satisfy their tax liabilities. In that regard, petitioners contend that Settlement Officer Lisanti erred by using Zillow.com to value the property and by ignoring the documented disrepair of the property and the copies of bids to repair the property that they submitted.

Second, petitioners contend that Settlement Officer Lisanti failed to consider their advanced age, their poor health, Dr. Jones' stated intention to retire, and the trauma relating to the 2006 fire that destroyed their home on the Moorpark properties.

Third, petitioners contend that Settlement Officer Lisanti erroneously included checking account balances of $5,550 in their net realizable equity in assets.

**[*17]** Fourth, petitioners contend that Settlement Officer Lisanti erroneously included the amount of their 2007-08 charitable contributions in calculating their net realizable equity in assets.

Fifth, petitioners contend that Settlement Officer Lisanti made several erroneous adjustments to the present value of their future income and expenses on her worksheet.

Finally, petitioners assert that their financial condition has worsened considerably since respondent issued the notice of determination and that Dr. Jones would like to retire immediately and continues working only because of his severe debts.

B.      Respondent's Arguments

Respondent contends that Settlement Officer Lisanti did not abuse her discretion in determining that petitioners' reasonable collection potential was sufficient to pay their tax liability in full.  As an initial matter, respondent contends that petitioners were afforded ample opportunity to submit materials supporting their OIC and to participate in a conference with Settlement Officer Lisanti but failed to do so.

With respect to petitioners' net realizable equity in assets, respondent contends that Settlement Officer Lisanti properly relied on the Zillow.com

**[*18]** estimate of value for the Lake Arrowhead property, rounded up to the nearest thousand to $356,000, reduced by 10% for a quick sale value (QSV) of $320,400, and reduced further by the outstanding mortgage balance on the property of $155,468, leaving equity of $164,932.  Moreover, respondent contends that even if the estimate of $74,240 for the allegedly required repairs on the property is deducted dollar for dollar, petitioners would still have $90,692 of equity in the property, which is more than sufficient to satisfy their outstanding tax liabilities. Respondent also contends that petitioners have $5,550 deposited in checking accounts, a Ford Explorer worth $1,000, and a Ford Explorer worth $2,500, the values of the vehicles being discounted to QSVs of $800 and $2,000, respectively. With respect to the 2007-08 charitable contributions, respondent contends that settlement officers are instructed to consider including dissipated assets in the reasonable collection potential calculation.  See Internal Revenue Manual (IRM) pt. 5.8.5.5 (Sept. 23, 2008).

With respect to petitioners' future income and expenses, respondent contends that Settlement Officer Lisanti properly determined that the present value of their future income and expenses was $193,152.  According to respondent, part of this amount is attributable to Settlement Officer Lisanti's determination that petitioners understated their monthly income, and part of this amount is

[*19] attributable to Settlement Officer Lisanti's disallowance of certain of petitioners' claimed expenses. Moreover, respondent contends that, even accepting all of petitioners' claimed expenses, the present value of petitioners' future income and expenses would still be $69,504.

Finally, respondent contends that Settlement Officer Lisanti did not abuse her discretion by failing to take into account the loss of petitioners' home in the 2006 fire and petitioners' continued expense in making payments on that property because petitioners failed to disclose the property and the payments on their Form 433-A.

III.    Petitioners' Section 6320 Hearing

A.    Offers-in-Compromise

Section 7122(a) authorizes the Secretary to compromise any civil or criminal case arising under the internal revenue laws before its referral to the Department of Justice. Section 7122(d) authorizes the Secretary to prescribe guidelines for officers and employees of the IRS to determine whether an OIC is adequate and should be accepted. Accordingly, we generally uphold the rejection of an OIC when the Appeals Office has followed the IRM. See, e.g., Churchill v. Commissioner, T.C. Memo. 2011-182, 102 T.C.M. (CCH) 116, 117 (2011);

[*20] <u>Atchison v. Commissioner</u>, T.C. Memo. 2009-8, 97 T.C.M. (CCH) 1034, 1036 (2009).

The regulations under section 7122 provide that an OIC is appropriate where there is doubt as to collectibility. Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. "Doubt as to collectibility exists in any case where the taxpayer's assets and income are less than the full amount of the liability." <u>Id.</u> "A determination of doubt as to collectibility will include a determination of ability to pay. In determining ability to pay, the Secretary will permit taxpayers to retain sufficient funds to pay basic living expenses." Sec. 301.7122-1(c)(2)(i), Proced. & Admin. Regs.; <u>see also</u> sec. 7122(d)(2)(A) and (B). Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517, states that

> [d]oubt as to collectibility exists in any case where the taxpayer's assets and income cannot satisfy the full amount of the liability.
>
> An offer to compromise based on doubt as to collectibility generally will be considered acceptable if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the Service could collect through other means, including administrative and judicial collection remedies. * * * This amount is the reasonable collection potential of a case. In determining the reasonable collection potential of a case, the Service will take into account the taxpayer's reasonable basic living expenses. In some cases, the Service may accept an offer of less than the total reasonable collection potential of a case if there are special circumstances.

[*21] Pursuant to the IRM, "[i]n determining the taxpayer's future ability to pay, full consideration must be given to the taxpayer's overall general situation including such factors as age, health, marital status, number and age of dependents, education or occupational training and work experience."  IRM pt. 5.8.4.4 (Sept.  23, 2008).

B.    Petitioners' Reasonable Collection Potential

Although Settlement Officer Lisanti attached a copy of her worksheet to the notice of determination, she also stated in the attached statement that because petitioners' net realizable equity in assets was $193,239, "[n]o further analysis is required".  Settlement Officer Lisanti further stated that the OIC was "unacceptable on its face" because petitioners' net realizable equity in assets would have been $9,050 according to the financial statements that petitioners submitted with their OIC.  Settlement Officer Lisanti then explained some of her reasoning in determining petitioners' net realizable equity in assets, but she did not explain any of her reasoning regarding the adjustments she made to petitioners' income and expenses.  From this we conclude that Settlement Officer Lisanti did not rely on her adjustments to petitioners' income and expenses in determining that petitioners' reasonable collection potential was greater than their OIC.

**[*22]** Respondent goes to great length to explain the adjustments on Settlement

Officer Lisanti's income and expense worksheet and contends that any abuse of

discretion with respect to the net realizable equity in assets calculation was harmless

because of the adjustments to petitioners' future income and expenses. But "our

role under section 6330(d) is to review actions that the IRS took, not actions that it

could have taken." Salahuddin v. Commissioner, slip op. at 16 (citing Chenery, 318

U.S. at 93-95); see also Rosenbloom v. Commissioner, 101 T.C.M. (CCH) at 1674

n.17.

> In Chenery, 318 U.S. at 93-94, the Supreme Court explained that

> [the agency's] action must be measured by what the * * * [agency] did,
> not by what it might have done. * * * The * * * [agency's] action
> cannot be upheld merely because findings might have been made and
> considerations disclosed which would justify its order as an appropriate
> safeguard for the interests protected by the Act. There must be such a
> responsible finding. * * *

See also Safe Air For Everyone, 488 F.3d at 1091 ("[O]ur review of an

administrative agency's decision begins and ends with the reasoning that the agency

relied upon in making that decision".). We have found that Settlement Officer

Lisanti did not rely on her adjustments to petitioners' income and expenses and that

she failed to explain any of her reasoning regarding those adjustments.

Accordingly, we decline to consider respondent's post hoc explanations of the

**[*23]** adjustments on Settlement Officer Lisanti's income and expense worksheet as a valid basis for sustaining respondent's determination.

Additionally, the notice of determination does not disclose that Settlement Officer Lisanti gave any consideration to the impact petitioners' advanced age and asserted poor health might have on petitioners' ability to pay, as required by IRM pt. 5.8.4.4. In fact, the statement attached to the notice of determination appears to confirm that Settlement Officer Lisanti gave no consideration to petitioners' age or claims of poor health. There is no documentation in the administrative record showing that Settlement Officer Lisanti ever asked for documentation of or disputed petitioners' asserted poor health, and respondent has offered no explanation for Settlement Officer Lisanti's statement that Dr. Jones is "in apparent good health" and that Mrs. Jones has "no known health problems." Although the Appeals Office does not have to list "every single fact that it considered in arriving at * * * [its] determination", Barnes v. Commissioner, T.C. Memo. 2006-150, 92 T.C.M. (CCH) 31, 35 (2006), aff'd in part, vacated in part sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009), it cannot misstate or fail to address significant and obviously relevant facts.[11] Because we cannot

---

[11]Significantly, most of petitioners' income is Schedule C income from Dr. Jones' dental practice. Accordingly, Dr. Jones' advanced age and asserted health

(continued...)

[*24] ascertain from the administrative record how Settlement Officer Lisanti arrived at her conclusion that petitioners were in good health in the face of information supplied by petitioners during the section 6320 hearing that they were not, we cannot evaluate whether Settlement Officer Lisanti abused her discretion in rejecting petitioners' OIC.

      C.     Petitioners' Net Realizable Equity in Assets

Pursuant to the IRM, a taxpayer's ability to pay for OIC purposes is determined in part by calculating the net realizable equity in the taxpayer's assets. IRM pt. 5.8.5.4.1(1) (Sept. 23, 2008). "Net realizable equity is defined as * * * (QSV) less amounts owed to secured lien holders with priority over the federal tax lien." Id. "QSV is defined as an estimate of the price a seller could get for the asset in a situation where financial pressures motivate the owner to sell in a short period of time, usually 90 calendar days or less." Id. pt. 5.8.5.4.1(2). "Normally, QSV is calculated at 80% of * * * [fair market value (FMV)]. A higher or lower

---

[11](...continued)
problems clearly have the potential to significantly affect petitioners' future income. By contrast, in cases such as Johnson v. Commissioner, T.C. Memo. 2007-29, 93 T.C.M. (CCH) 885, 889 (2007), aff'd in part, vacated in part sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009), the failure to address the taxpayers' age and health was deemed insignificant because the taxpayers relied principally on income that was not contingent upon employment.

[*25] percentage may be applied in determining QSV when appropriate, depending on the type of asset and current market conditions." Id. pt. 5.8.5.4.1(3).

Petitioners contend that Settlement Officer Lisanti erred in her determination of the FMV of the Lake Arrowhead property, in her calculation of petitioners' checking account balances, and in her inclusion of the total amount of petitioners' 2007-08 charitable contributions, as dissipated assets, in her calculation of petitioners' net realizable equity in assets. We address each of these contentions in turn.

### 1. Lake Arrowhead Property Valuation

#### a. Evidentiary Issues

Before we decide whether Settlement Officer Lisanti erred in determining that petitioners had realizable equity of $164,932 in the Lake Arrowhead property, we must first resolve an evidentiary dispute regarding two documents that petitioners sought to introduce into evidence to support their contention that they had no equity in the Lake Arrowhead property. The first of these documents is a letter from a loan officer at Mountain West Financial, Inc., dated September 7, 2010, and the second is an appraisal of the Lake Arrowhead property dated September 17, 2010. Respondent objected to the introduction of these documents because both postdate the administrative record and are thus irrelevant in

[*26] determining whether Settlement Officer Lisanti abused her discretion in sustaining the filing of the NFTL.

Respondent contends, and we agree, that the U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), has adopted the administrative record rule in section 6320 cases where the underlying liability is not at issue, see Keller, 568 F.3d at 718; Jordan v. Commissioner, 134 T.C. 1, 9 (2010); see also Robinette v. Commissioner, 439 F.3d 455 (8th Cir. 2006), rev'g 123 T.C. 85 (2004). Accordingly, under Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we must sustain respondent's objections.

b.     Respondent's Valuation of the Lake Arrowhead Property

The IRM in effect during 2009 provided the following methods for determining the FMV of real estate for OIC purposes:  a recent purchase price or an existing contract to sell; recent appraisals; a real estate tax assessment; a market comparable; and a homeowner's insurance replacement cost.[12]  IRM pt. 5.8.5.4.11(2) (Sept. 23, 2008).

---

[12]The current version of the Internal Revenue Manual (IRM) provides that internal sources, such as Accurint, can also be used to determine the FMV of real property.  IRM pt. 5.8.5.12 (Oct. 22, 2010).

[*27] In their Form 433-A petitioners stated under penalty of perjury that the Lake Arrowhead property had a current value of $155,000. However, in the statement attached to the notice of determination, Settlement Officer Lisanti determined, on the basis of a valuation obtained using Zillow.com, that the Lake Arrowhead property had a fair market value of $356,000, apparently rounded up to the nearest thousand. In so doing, Settlement Officer Lisanti used the "Zestimate" provided by Zillow.com, which was near the higher end of the "Value Range" of $245,295 to $369,720 that accompanied that estimate. Settlement Officer Lisanti then reduced that amount by 10% for a QSV of $320,400, but she did not explain why she used a 10% reduction as opposed to the standard 20% reduction used to calculate QSV. Settlement Officer Lisanti then subtracted the outstanding mortgage balance on the property of $155,468, for net realizable equity of $164,932.

Settlement Officer Lisanti never asked petitioners to provide an appraisal or to otherwise substantiate the value they placed on the Lake Arrowhead property. Moreover, petitioners submitted several documents on or around April 22, 2009, to substantiate their assertion that the Lake Arrowhead property required significant repairs, but Settlement Officer Lisanti never considered those documents. Only after Settlement Officer Lisanti faxed Mr. Heinrich a copy of her

[*28] worksheet on November 10, 2009, were petitioners or Mr. Heinrich aware that Settlement Officer Lisanti disputed their position that they had no equity in the Lake Arrowhead property. On November 12, 2009, Mr. Heinrich purportedly promised Settlement Officer Lisanti additional documents supporting petitioners' valuation of the Lake Arrowhead property by as late as November 20, 2009. Yet on November 19, 2009, Settlement Officer Lisanti left a voicemail for Mr. Heinrich, informing him that she would be closing the case. It is also unclear what new documents Settlement Officer Lisanti expected Mr. Heinrich to provide on such short notice.

In this context, Settlement Officer Lisanti's reliance on the "Zestimate" provided by Zillow.com to determine the FMV of the Lake Arrowhead property, despite petitioners' sworn statement that the Lake Arrowhead property had a significantly lower value, without additional investigation, was clearly erroneous. Zillow.com itself states that its "Zestimate" "is not an appraisal. It is a starting point in determining a home's value."[13] What is a Zestimate?, Zillow.com, http://www.zillow.com/wikipages/What-is-a-Zestimate/ (last visited June 18,

_____

[13]We note that respondent's counsel also objected to the appraisal that petitioners were trying to introduce into evidence on the grounds that the appraisal specifically stated that "This appraisal report is intended for use by the owner and subject for personal reasons only. This report is not intended for any other use."

[*29] 2012). Moreover, Settlement Officer Lisanti did not consider the "Value Range" provided in the Zillow.com report. Significantly, had Settlement Officer Lisanti considered that range and the documented disrepair of the Lake Arrowhead property, she might have agreed with petitioners' position that they had no equity in the Lake Arrowhead property.[14] At a minimum, Settlement Officer Lisanti should have provided petitioners a meaningful opportunity to substantiate their position.

Settlement Officer Lisanti first notified petitioners that she disagreed with their valuation of the Lake Arrowhead property on November 10, 2009, when she faxed Mr. Heinrich her worksheet. On November 19, 2009, she left a voicemail for Mr. Heinrich, informing him that she would be closing the case. We do not think that this constituted a meaningful opportunity for petitioners to substantiate their position.

Because we find that Settlement Officer Lisanti erred by failing to consider the documented disrepair of the property and by failing to provide petitioners a

---

[14]For example, if Settlement Officer Lisanti had assumed that the FMV of the Lake Arrowhead property, without factoring in the required repairs, was $245,295, which is at the low end of the Zillow.com "Value Range", the QSV of the property, as calculated by Settlement Officer Lisanti, would have been $220,766. After subtracting the $74,240 in work estimates that petitioners provided, the QSV would be $146,526, which is less than the outstanding mortgage balance on the property of $155,468.

**[\*30]** meaningful opportunity to substantiate their position, we need not decide at this time whether Zillow.com, or similar Web sites, are appropriate tools for determining the FMV of real property in the context of section 6320 hearings or otherwise. Cf. In re Darosa, 442 B.R. 173, 177 (Bankr. D. Mass. 2010) (suggesting that Zillow.com's "Zestimates" are unreliable and can be manipulated by users).

### 2. Checking Account Balances

In calculating petitioners' net realizable equity in assets, Settlement Officer Lisanti included $5,550 for amounts in petitioners' checking accounts. However, petitioners listed two checking accounts on their Form 433-A, one with a balance of $1,250 and the other with a balance of $300. Settlement Officer Lisanti should have realized that petitioners made a typographical error in entering the total as $5,550, rather than $1,550.

### 3. 2007 and 2008 Charitable Contributions as Dissipated Assets

Dissipation of assets is "[t]he use of an asset for an illegal or inequitable purpose". Black's Law Dictionary 541 (9th ed. 2009) (defining "dissipation"). Pursuant to IRM pt. 5.8.5.5(1), an asset is dissipated if it has "been sold, gifted, transferred, or spent on non-priority items or debts and are no longer available to pay the tax liability." Dissipated assets could be included in a taxpayer's

**[\*31]** reasonable collection potential either because the tax collector is understandably concerned that the assets may only appear to have dissipated, see Tucker v. Commissioner, T.C. Memo. 2011-67, 101 T.C.M. (CCH) 1307, 1314 (2011), aff'd, 676 F.3d 1129 (D.C. Cir. 2012), or "to deter delinquent taxpayers from wasting money that they owe and should pay as taxes", id. Accordingly, for a dissipated asset to be added to a taxpayer's reasonable collection potential, an asset that should otherwise have been available to satisfy the taxpayer's tax liability must be identified as having been dissipated. See IRM pt. 5.8.5.5(1).

The IRM has specific guidelines for how dissipated assets should be treated in the context of an OIC: (1) It must be determined that assets were dissipated and are no longer available to pay the tax liability. Id. (2) The investigation should determine whether the dissipated assets should be included in the taxpayer's reasonable collection potential. Id. pt. 5.8.5.5(2). (3) Inclusion of dissipated assets in the reasonable collection potential calculation should be documented in the administrative record. Id. pt. 5.8.5.5(3). (4) The determination that assets were dissipated should consider: the timing of such dissipation in relation to when the taxpayer submitted the offer and to when the liability arose; how the assets were transferred; whether the taxpayer realized funds from the transfer and how the funds were used; the value of the transferred assets; and the taxpayer's interest

**[*32]** in those assets.  Id.  (5) Where the taxpayer can show that dissipated assets were spent on necessary living expenses, the dissipated assets should not be included in the taxpayer's reasonable collection potential.  Id. pt. 5.8.5.5(4).

In her worksheet Settlement Officer Lisanti added $19,957 to petitioners' net realizable equity in assets on account of petitioners' 2007 and 2008 charitable contributions.[15]  The stated reason for this inclusion was that these contributions constituted dissipated assets.  However, Settlement Officer Lisanti did not explain her reasoning for characterizing charitable contributions as dissipated assets, nor did she describe her analysis in the notice of determination or in any part of the administrative record.  Without such an explanation, we cannot properly review Settlement Officer Lisanti's conclusion and evaluate its impact on the Appeals Office's determination.  See Safe Air For Everyone, 488 F.3d at 1091; Salahuddin v. Commissioner, slip op. at 16; Rosenbloom v. Commissioner, 101 T.C.M. (CCH) at 1674 n.17.

---

[15]Petitioners claimed charitable contribution deductions of $17,487 and $2,470 for 2007 and 2008, respectively.  We infer that Settlement Officer Lisanti based her conclusion that assets were dissipated solely on the fact that petitioners claimed charitable contribution deductions for 2007 and 2008.

[*33] D.     Petitioners' Failure To Disclose the Washington Mutual Account

The Appeals Office can deny a taxpayer's OIC based on doubt as to collectibility if it reasonably determines that the taxpayer failed to disclose assets. See Schropp v. Commissioner, T.C. Memo. 2010-71, 99 T.C.M. (CCH) 1298, 1304 (2010), aff'd, 405 Fed. Appx. 800 (4th Cir. 2010).

In the statement attached to the notice of determination, Settlement Officer Lisanti stated that petitioners had reported $3,968 of interest income from accounts that petitioners did not include on the financial statements they provided.  According to Settlement Officer Lisanti, this indicated that "there may be additional * * * assets that should be part of the * * * [reasonable collection potential] calculation that are not included on my worksheet."

At trial, however, respondent conceded that Settlement Officer Lisanti knew that these accounts contained insurance proceeds from the fire that destroyed petitioners' home on the Moorpark properties in 2006.  Despite her knowledge of the fire and the insurance proceeds, Settlement Officer Lisanti never requested documents relating to these accounts, and there is no indication in the record that she was concerned about these accounts before issuing the notice of determination.  We infer that Settlement Officer Lisanti was either satisfied that these funds should not be included in petitioners' net realizable equity in assets or

**[\*34]** knew that the funds in the accounts had been depleted. This is consistent with petitioners' testimony at trial that they could not spend the insurance proceeds without approval from the banks and that the funds were all used to pay various necessary expenses. Considering that Settlement Officer Lisanti knew about the source of the funds in the accounts, we also question her assertion that she did not know whether any funds remained in the accounts. In any event, Settlement Officer Lisanti's knowledge of the fire that destroyed petitioners' home and of the source of the funds in the accounts and her apparent failure to inquire further about the existence and use of the insurance proceeds render her conclusion that the accounts were undisclosed unreasonable.

IV.  Propriety of Remand

We may under certain circumstances remand a case to the Commissioner's Appeals Office while retaining jurisdiction. See Lunsford v. Commissioner, 117 T.C. at 189. The resulting section 6320 hearing on remand provides the parties with an opportunity to complete the initial section 6320 hearing while preserving the taxpayer's right to receive judicial review of the ultimate administrative determination. Drake v. Commissioner, T.C. Memo. 2006-151, 92 T.C.M. (CCH) 37, 44 (2006), aff'd, 511 F.3d 65 (1st Cir. 2007). It is well settled that we may remand in section 6320 cases where the Appeals Office has abused its discretion

[*35] in some way.  See, e.g., Churchill v. Commissioner, 102 T.C.M. (CCH) at 118; Med. Practice Solutions, LLC v. Commissioner, T.C. Memo. 2009-214, 98 T.C.M. (CCH) 242, 247 (2009).  Because the administrative record does not adequately disclose the analysis of the Appeals Office in determining that the OIC was not acceptable and that the filing of the NFTL should be sustained and because petitioners were not afforded a meaningful opportunity to substantiate their position with respect to the valuation of the Lake Arrowhead property, remand is appropriate in this case.[16]

V.    Conclusion

We have considered the parties' remaining arguments and, to the extent not discussed above, conclude that those arguments are irrelevant, moot, or without merit.  For the reasons identified above, we will remand this case to the Appeals Office for further proceedings consistent with this opinion.

To reflect the foregoing,

An appropriate order will be issued.

---

[16]Upon remand the Appeals Office shall consider any additional information or evidence that petitioners may wish to submit, any new collection alternative that petitioners may wish to propose, and any asserted change in circumstances.  See Leago v. Commissioner, T.C. Memo. 2012-39, slip op. at 24.